662 A.2d 621

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ernest SIMMONS, Appellant.**

Supreme Court of Pennsylvania.

Argued March 9, 1995.

Decided July 19, 1995.

212

214

216

218

220

222

Kenneth Sottile, Michael Filia, Asst. Public Defenders, for appellant.

Christian A. Fisanick, Chief Deputy–Appellate Div., Patrick Caniry, First Asst. Dist. Atty., Gary Costlow, Asst. Dist. Atty., for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

CASTILLE, Justice.

Following a four (4) day jury trial, appellant was found guilty of first degree murder[1] and robbery[2] in connection with the May 5, 1992 death of eighty year old Anna Knaze. Following the penalty hearing, the jury found three aggravating circumstances and no mitigating circumstances, and set the penalty at death.[3] Post-verdict motions were filed and arguments were held on August 27, 1993. On January 13, 1994, appellant's post-verdict motions were denied. On February 17, 1994, the trial court imposed the jury's sentence of death, as well as other terms of imprisonment on appellant's conviction for robbery.[4] This direct appeal followed. For the reasons expressed herein, we affirm the judgment of sentence imposed by the Court of Common Pleas of Cambria County.

As is required in all cases where the death penalty has been imposed, this Court must conduct a review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing a sufficiency of the evidence claim, an appellate court, viewing all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, must determine whether the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 3701(a).

3. The three aggravating circumstances found by the jury were that: (1) appellant committed the death while in the perpetration of a felony (robbery), 42 Pa.C.S. § 9711(d)(6); (2) the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8); and (3) appellant had a significant history of felony convictions involving the use or threat of violence of the person, 42 Pa.C.S. § 9711(d)(9).

4. With respect to appellant's robbery conviction, the trial court imposed a sentence of ten (10) to twenty (20) years imprisonment, to run consecutive to the sentence for first-degree murder.

11, 13 (1992). Using this standard, the record below establishes the following facts:

On the morning of May 5, 1993, appellant drove one of his girlfriends, LaCherie Pletcher, as well as Kitty McKinney (who is a friend of Pletcher) and her mother, from their apartments in Coopersdale Homes to their respective appointments in Johnstown. Appellant dropped Pletcher off at the Cambria County Domestic Relations Office in Johnstown at approximately 10:05 a.m. so that she could have blood work done. Appellant then proceeded to take Kitty McKinney and her mother to a gas station in Conemaugh so that she could pick-up her car. Before appellant dropped McKinney off at the gas station at approximately 10:35 a.m., he informed her that he was going to travel up through Prospect and back into town to pick-up LaCherie Pletcher. However, McKinney, while waiting outside the garage, noticed that appellant did not drive towards the area where Pletcher was to be picked up. Instead, appellant turned around and headed in a different direction towards the Woodvale section of Johnstown. The Woodvale section is where the victim, Anna Knaze, lived.

LaCherie Pletcher finished with her blood work at approximately 10:30 a.m. While Pletcher waited for appellant to return for her, she unsuccessfully attempted to locate appellant at his work. Appellant eventually returned for Pletcher at 11:45 a.m. Appellant then proceeded to drop Pletcher off at the school she was attending for her general equivalency diploma.

Other evidence produced at trial showed that sometime between 11:00 a.m. and 11:30 a.m. on May 5, 1992, Anna Knaze, the eighty-year old victim, was observed talking with a black man who wore distinctive sunglasses outside of her house in the Woodvale section of Johnstown. This observation was made by Thelma Blough, Tammy Ickes and Gary Blough, who lived in the house next door to the victim, as well as by Patricia Gonda, a witness who worked at a day care center across the street from the victim's house. All four of these people identified appellant as the man they saw talking with

the victim on the morning of the murder.[5] All four people also testified that the sunglasses were distinctive because the stems were wider than an ordinary pair of sunglasses and there was extremely large gold trim on the hinges. Thelma Blough, Gary Blough and Patricia Gonda identified the sunglasses of appellant which were admitted into evidence as being the ones they saw him wearing on the day of the murder.

Thelma Blough and Tammy Ickes heard the appellant ask the victim if he could use her telephone claiming that his car had broken down. Appellant and the victim then proceeded to enter her house. This was the last time that anyone ever saw the victim alive. Also, the three witnesses who lived next door to the victim testified that they never observed appellant leave the house. One of these witnesses, Thelma Blough, testified that no lights were ever turned on in the victim's house on the evening of May 5, 1992 and that this was unusual for the victim.

At approximately 5 p.m. on May 6, 1992, Stephen Knaze, the victim's son, received a telephone call from his sister-in-law to go to his mother's house because a neighbor informed her that his mother's mail was still in the mailbox. Stephen Knaze proceeded to his mother's house where he found her door slightly ajar. Upon entering the house, Stephen Knaze found

---

**5.** The three people who observed appellant from the house next door were Thelma Blough, Tammy Ickes and Gary Blough. Thelma Blough initially was unable to pick appellant from a six person photo array. However, she later identified appellant as the man she observed on May 5, 1992 at appellant's preliminary hearing. Tammy Ickes, the girlfriend of Thelma Blough's son Gary, was also unable to pick appellant from the same six person photo array. However, Ickes first positively identified appellant at the coroner's inquest. *See Commonwealth v. Smith*, 518 Pa. 15, 32–33, 540 A.2d 246, 254 (1988) (prior failure to identify defendant goes to weight and credibility of eyewitness's testimony). Gary Blough did not speak to police after the murder because he was wanted on a parole violation. Gary Blough first recognized appellant as the person outside the victim's house when he saw appellant in prison.

Patricia Gonda was the witness who observed appellant from the day care center. Gonda was first able to pick appellant as the man outside with the victim after she reviewed approximately three to five hundred police photographs.

his mother lying dead on the floor in the dining room by the stairs which led to the second floor. After searching the house, Stephen Knaze noticed that his mother's favorite pocketbook was missing. The pocketbook was never found.

An autopsy was performed on the victim's body at approximately 10:00 a.m. on May 7, 1992. The autopsy showed that: (1) the victim had been manually strangled; (2) her spine between the T11 and T12 was severed as a result of her back either being hit by a hard object or by a blunt trauma possibly caused by a human fist; and (3) that all twelve pairs of the victim's ribs had been broken, which indicated that she was repeatedly either hit hard or punched or squeezed with substantial force. Based on the autopsy, the victim's death was ruled a homicide with the cause of death being listed as manual strangulation causing asphyxia. Because of the level of rigor in the victim's body, her death was estimated to have occurred forty-four (44) to forty-eight (48) hours prior to when the autopsy was begun. Thus, the victim's death occurred sometime between 10:00 a.m. and 2:00 p.m. on May 5, 1992.

The testimony of David Mack was also presented at trial. Mack knew appellant since August or September of 1991 and usually saw appellant on a monthly basis. On May 6, 1992, Mack saw appellant near the beauty shop at which appellant worked. When he saw appellant, Mack noticed that appellant had a fairly large bandage on the back of his left hand. Mack could not specifically remember the reason appellant gave for wearing the bandage other than that he suffered some type of injury.

Evidence was also offered at appellant's trial by Margaret Cobaugh, a sixty-two year old woman who lived on Figg Street in the Midvale section of Johnstown. Cobaugh testified that on April 1, 1992, her purse was stolen while she worked at the senior activity center in Johnstown. One of the items stolen from her purse was a photo driver's license. LaCherie Pletcher later testified that after the April 1, 1992 theft but before the May 5, 1992 murder, she found a photo driver's license of an elderly woman who lived on Figg Street when she was going through appellant's wallet. Upon being shown

a picture of Cobaugh's current driver's license, Pletcher stated that the license she saw in appellant's wallet belonged to Cobaugh.

Margaret Cobaugh also testified about an experience she had at approximately 1 a.m. on May 6, 1992, just ten (10) to fourteen (14) hours after the time established for the victim's murder. According to Cobaugh's testimony, a neighbor who was having trouble breathing telephoned her requesting Cobaugh's assistance. Upon arriving at her neighbor's house, Cobaugh called an ambulance service for assistance.

After helping her neighbor, Cobaugh began to return to her home. Before reaching her house, a man smelling of alcohol who Cobaugh identified as the appellant, grabbed Cobaugh from behind and placed his hand over her mouth.[6] Cobaugh noticed that appellant was wearing distinctive sunglasses during the attack, which was unusual since it was nighttime, and identified the pair which was admitted into evidence as being the ones she observed. At the time he accosted her, appellant threatened her that "if you open your mother fucking mouth, you'll get the same thing Anna Knaze got." Even though Cobaugh knew the victim, at that time she had no idea what appellant meant by the statement since the victim's dead body was not found until approximately fourteen (14) hours later. After saying this, appellant attempted to rape Cobaugh. Cobaugh reported this incident to the police later that morning after she arrived at work at the senior activity center.

According to LaCherie Pletcher, she did not see appellant from the time he dropped her off at school in the early afternoon on May 5, 1992 until the early morning hours of May 6, 1992. When appellant arrived at her door on the morning of the 6th, Pletcher testified that he was drunk and smelled like a brewery.

In first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person

6. Presumably appellant knew of Cobaugh's address from having stolen her purse and identification a few weeks earlier.

accused did the killing, and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). When there is no direct evidence of intent to kill, the fact-finder must glean the intent from the act itself and all surrounding circumstances. *Commonwealth v. Meredith,* 490 Pa. 303, 311, 416 A.2d 481, 485 (1980). Specific intent to kill can be proven if the defendant knowingly applies deadly force to the person of another. *Id.* Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first degree murder. *See Commonwealth v. Harvey,* 514 Pa. 531, 538, 526 A.2d 330, 334 (1987) (appellant's admission that he placed strap around victim's neck and applied pressure until death resulted was sufficient to find specific intent); *Commonwealth v. Johnson,* 459 Pa. 141, 147, 327 A.2d 124, 127 (1974) (placing knotted cord around neck of elderly woman and rigging it so as to strangle victim is consistent with specific intent to take the life of another); *Commonwealth v. Graves,* 310 Pa.Super. 184, 189, 456 A.2d 561, 569 (1983) (jury entitled to find the specific intent to kill required for first degree murder where ten year old child strangled to death).

Here, the evidence presented at trial showed appellant was in the victim's neighborhood on the day of the murder. Also, eyewitnesses placed appellant in the front of the victim's house at the time of the murder. These same eyewitnesses observed appellant entering the victim's house on the day of the murder, which was the last time anyone ever saw the victim alive. Moreover, evidence established that appellant, when attempting to rape Margaret Cobaugh, had knowledge of the victim's murder even though her dead body was not discovered until approximately fourteen (14) hours later. Finally, the victim's body showed that when she died from asphyxia due to strangulation, all of her ribs were broken and her spine was severed because of blunt trauma. This evidence was sufficient to establish that appellant acted with malice aforethought and with a specific intent to kill. *See Commonwealth v. Rivers,* 537 Pa. 394, 403, 644 A.2d 710, 714 (1994) (specific intent to kill for first-degree murder established by

circumstantial evidence which showed that defendant: had access to victim's home; was in vicinity on night of murder; was observed shortly after murder with blood stained clothes; and, boasted of having robbed and stabbed someone).

Turning now to appellant's claims, he contends that his conviction was against the weight of the evidence because of conflicts and inconsistencies in testimony presented at trial. Appellant alleges that the following inconsistencies preclude a finding of guilt: (1) Patricia Gonda's testimony (who appellant incorrectly cites as Carolyn Fetzko) that she saw appellant on a later date in the vicinity of the victim's home at a time when he was in prison; (2) the eyewitnesses' inconsistent testimony regarding identification of appellant; and (3) Margaret Cobaugh's testimony that she called an ambulance for her next door neighbor on the early morning hours of May 6, 1992 when no ambulance service had a record of such a call.

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Jackson*, 506 Pa. 469, 475, 485 A.2d 1102, 1104 (1984). We, as an appellate court, cannot substitute our judgment for that of the finder of fact. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982). Thus, we can only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155 (1986).

After examining the evidence in this case, we find that appellant's assertion that the inconsistencies in the witnesses' testimony rendered them incredible to have no merit since the inaccuracies claimed are only minor and a witness's credibility is solely for the jury to determine.[7] *See Commonwealth v.*

7. Appellant also asserts that the fact that he was convicted in spite of these inconsistencies magnifies the prejudice which he suffered from the following incidents: (1) the trial court's admission of Margaret Cobaugh's testimony about the context in which appellant made the statement about the victim; (2) Margaret Cobaugh fainting in front of the jury after her testimony; and (3) the Commonwealth's reference to

*Davis*, 518 Pa. 77, 82, 541 A.2d 315, 317 (1988) ("as the phenomenon of lying is within the ordinary capacity of jurors to assess, the question of a witness's credibility is reserved exclusively for the jury"). Thus, after examining the evidence in this case, we find nothing to support appellant's assertion that his conviction was against the weight of the evidence as the verdict hardly shock's one conscience. Accordingly, this claim is rejected.

Appellant's second claim is that the trial court erred in precluding him from presenting the expert testimony of Dr. Stephen Penrod on the reliability of eyewitness identification. Appellant contends that Dr. Penrod would have testified on the general psychological characteristics and behavior patterns regarding eyewitness identification. Appellant asserts that this testimony was proper "to educate the jury on possible factors that may affect a person's perception, and that if the jury decided to consider and use this general knowledge in assessing a particular witness's reliability—and ultimately credibility—then that would not improperly invade the province of the jury." Appellant's Brief at 14.

It has long been established that expert testimony is only admissible where formation of an opinion on a subject requires knowledge, information, or skill beyond that possessed by the ordinary juror. *Commonwealth v. Seese*, 512 Pa. 439, 442, 517 A.2d 920, 921 (1986). Expert opinion cannot be offered to intrude upon the jury's basic function of deciding credibility. *Commonwealth v. Spence*, 534 Pa. 233, 245, 627 A.2d 1176, 1182 (1993) (testimony of psychologist as to the effects of stress upon people who are called to make identifica-

Margaret Cobaugh's fainting incident in its closing. In essence, appellant contends that without these prejudicial incidents, the jury never would have rendered a guilty verdict since it was against the weight of the evidence. However, we will not address these factors when examining this weight of the evidence claim for two reasons. First, these alleged instances of prejudice are related to claims which are distinct from a weight of the evidence claim (e.g. whether mistrial was warranted; whether evidence was improperly admitted, etc.). Second, appellant raises these prejudicial incidents as separate claims in this direct appeal. Thus, in an effort to avoid repetition and confusion, this Court will examine these prejudice arguments separately.

tions was properly excluded); *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988) (error to allow expert witness in the area of rape trauma to explain that such trauma could prevent a victim from making a timely identification of assailant); *Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315 (1988) (error to allow expert to testify that child sex abuse victims generally lack the ability to fabricate stories of sexual experiences).

Here, appellant's expert would have testified generally about the reliability of eyewitness identification. Such testimony would have given an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary juror can assess. Moreover, appellant was free to and did attack the witnesses' credibility and point out inconsistencies of all the eyewitnesses at trial through cross-examination and in his closing argument. Thus, the trial court properly excluded appellant's proposed expert testimony. Accordingly, this claim is rejected.

Appellant's third claim is that the Commonwealth violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by impermissibly using a peremptory challenge to exclude Carolin Jenkins, a black female, from the jury in order to limit the number of black jurors who served at trial. To sustain a *prima facie* case of improper use of peremptory challenges, a defendant must establish the following: (1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can then rely on the fact that the use of peremptory challenges permits "those to discriminate who are a mind to discriminate; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. *Commonwealth v. Dinwiddie,* 529 Pa. 66, 70–71, 601 A.2d 1216, 1218 (1992). This third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of jurors acceptable to the

Commonwealth who were stricken by the defense. After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race. If the trial court finds in the affirmative, it may then require the prosecutor to explain his or her reasons for the challenge. *Commonwealth v. Spence*, 534 Pa. 233, 246, 627 A.2d 1176, 1182–83 (1993); *Batson, supra.* Once the defendant makes a *prima facie* showing, the burden shifts to the Commonwealth to come forward with a neutral explanation for challenging black jurors. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23. A finding by the trial court as to discriminatory intent must be given great deference on appeal. *Commonwealth v. Young*, 536 Pa. 57, 637 A.2d 1313, 1319 (1993).

■ Here, appellant failed to make an adequate record for appeal in that he has done nothing to inform the Court regarding the categories identified in *Spence, supra.* Instead, appellant alleged at trial, and now on appeal, only that a *Batson* violation occurred because a peremptory challenge was used on one of the black venirepersons. The use of a peremptory challenge on a single person of color without more is insufficient to establish a *Batson* violation. *See Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435, 442–43 (1994) (standing alone, fact that prosecutor used between 10 to 12 challenges to exclude black persons from jury was insufficient to establish a *Batson* violation); *Commonwealth v. Jackson*, 385 Pa.Super. 401, 561 A.2d 335, 341 (1989), *aff'd*, 526 Pa. 294, 585 A.2d 1001 (1991) (no per se rule that prima facie case exists if prosecutor uses peremptory challenge to strike black individuals).

The record in the instant matter shows that only three black individuals in the group of one hundred and fifteen (115) venirepersons were available for appellant's trial. Of those three, one black male was chosen for the jury, whom appellant himself had sought to strike. (N.T. 5/26/93 at 76–77). According to the record, the Commonwealth exercised one of its peremptory challenge on Carolin Jenkins, one of the two remaining black venirepersons, because she failed to answer

all of the questions asked in the beginning of the selection process.[8] The Commonwealth explained that her failure to comply with instructions during voir dire raised concerns over whether she could properly follow the court's instructions on other matters. Given the seriousness of this case, the Commonwealth chose to strike her. The Commonwealth also stated that it struck her because it wanted a "male/female balance" on the jury. (N.T. 5/25/93 at 155–56). Based on our review of the record, we simply cannot conclude that the trial court erred in ruling that appellant failed to establish any facts or circumstances which raise an inference of purposeful discrimination based on race.[9] Accordingly, this claim is rejected.

Appellant's fourth claim is that he is entitled to a new trial because the trial court erred in allowing the Commonwealth to refer to the existence of a letter written by appellant to LaCherie Pletcher in order to rehabilitate her on re-direct as to inconsistent statements she had made in previous proceedings regarding when appellant returned home on the day of the murder. Appellant asserts that he was prejudiced by this usage since it constituted a reversal of the trial court's pre-trial ruling that the letter was only admissible to impeach appellant.[10]

8. Neither the parties nor the record reveal what happened to the third black venireperson.

9. We acknowledge that the Commonwealth's reason of desiring a male/female balance may run afoul of the United States Supreme Court decision in *J.E.B. v. Alabama Ex Rel., T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) which prohibits the exercise of peremptory challenges which discriminate based on gender. However, this issue was not raised on appeal and appellant only mentions gender as an invalid reason offered by the Commonwealth for striking Jenkins in order to exclude blacks from the jury.

10. In a pre-trial ruling, the trial court limited the Commonwealth's usage of the letter written by appellant to Pletcher to impeachment of appellant. The Commonwealth argued that the letter was relevant to show that appellant, who knew that he was under investigation for the victim's murder, wrote a letter to Pletcher which falsely described his movements at various times on the day of the murder so that Pletcher would support his alibi. The trial court ruled that this letter was not relevant to anything other than impeaching appellant's testimony if he took the stand.

234

Specifically, appellant complains regarding the following exchange by the Commonwealth during re-direct which referred to the existence of the letter:

Q: Cherie, you were asked about your testimony at prior proceedings concerning the time Ernie came home on the night of May the 5th or early morning of May the 6th. Do you recall those questions a few moments ago?

A: Yeah.

Q: And counsel for Mr. Simmons said that you had given a different answer on those prior occasions, is that right?

A: Yeah.

Q: What was the explanation that you gave as to why you said 10:00 o'clock before but it is a different time now?

A: Because I got the letter that Ernie sent, had written to me and I had realized that it was the 5th he had gotten drunk instead of the 6th. I hadn't realized that.

Q: What did Ernest do, send you a letter?

A: Yeah, he sent me the letters with the times and places he was.

Q: And once you read the letter as to what he told you, you then recalled it wasn't 10:00 o'clock, it was a later time?

A: Yeah.

Q: And then you recalled that, in fact, he was drunk that night when he came back?

A: Yeah.

Q: So it was Mr. Simmons [sic] own letter to you that refreshed your memory as to exactly that night and the fact that he was drunk, is that correct?

A: Yes.

(N.T. 6/2/93 at 156–57).

Significantly, the existence of the letter which appellant wrote to Pletcher was first revealed during Pletcher's cross-examination by appellant's counsel:

Q: He came in drunk that night?

A: Yeah, I couldn't remember if it was the 5th or the 6th and they showed me a letter that Ernie had written me with

the times and where he had been at and I realized it was the 5th.

(N.T. 6/2/93 at 138). Appellant neither objected to Pletcher's answer nor requested that the answer be stricken.

Appellant then sought to impeach Pletcher with prior inconsistent statements she had made at the coroner's inquest as to the time appellant had returned home on the day of the murder. Specifically, appellant asked Pletcher to read the following from the coroner's inquest:

Q: Could you read line six, the question? You read that.

A: (Reading) When was the next time—when was the next time you saw him?

Q: You saw Ernest, correct?

A: Um-hum.

Q: And could you read your answer?

A: I said, 10:00 o'clock. But I hadn't—but I had not realized that—I had not realized—

Q: So that—

Mr. Kiniry: Let her finish the answer.

The WITNESS: I had looked on the letter that he had written to me telling what times and what he had done. I hadn't realized that that was the night he had gotten drunk.

(N.T. 6/2/92 at 142). Once again, appellant neither objected to Pletcher's answer nor requested that it be stricken.

■ Admissibility of evidence is a matter addressed to the sound discretion of the trial court, which may only be reversed upon a showing that the court abused its discretion. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176, 178 (1985). Here, contrary to appellant's assertion, we find that there was no reversal of the trial court's pre-trial ruling concerning the admissibility of this letter. The record is devoid of any evidence that the letter or its contents were ever admitted into evidence. Moreover, having first elicited testimony regarding the existence of the letter when attacking Pletcher's credibility during cross-examination, appellant cannot now complain about the Commonwealth's use of the existence of the letter to

rehabilitate Pletcher's credibility on re-direct. *See Common-wealth v. Ford,* 539 Pa. 85, 650 A.2d 433, 442 (1994) (where defendant opens the evidentiary door to his past criminal conduct, the Commonwealth may cross-examine on this point).

 Assuming *arguendo,* however, that the Common-wealth's passing reference to the existence of the letter was improper, no new trial is warranted because any resulting error was harmless since appellant cannot show he suffered any prejudice. Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Common-wealth v. Williams,* 524 Pa. 404, 573 A.2d 536 (1990).

Here, appellant asserts that he desired to exclude all reference to the letter since one could infer it was written to induce Pletcher to supply him with a false alibi. However, as stated previously, appellant neither objected to Pletcher's initial reference to the existence of the letter nor moved to strike her answer. Also, our review of all questions and answers at trial regarding the letter convinces us that appellant suffered no prejudice because neither the contents of the letter were revealed nor was sufficient evidence produced that could lead to one drawing the inference which appellant sought to exclude. Moreover, the trial court limited the Commonwealth's usage of the letter to rehabilitate Pletcher during re-direct to that which was disclosed during cross-examination. In particular, the Commonwealth only referred to the existence of the letter to explain Pletcher's prior inconsistent statements about the time appellant returned home. (N.T. 6/2/93 at 138, 142, 156–157). Furthermore, appellant fails to develop how this limited reference to the existence of the letter by the Commonwealth caused him to change his trial strategy. Thus, we

conclude that any possible error resulting from the reference to the existence of the letter was harmless.

¶ Appellant also claims he should receive a new trial because the Commonwealth failed to comply with Rule 305 of the Pennsylvania Rules of Criminal Procedure when it only disclosed two out of the six pages of appellant's letter to Pletcher during pre-trial discovery. Pursuant to Rule 305(E) of the Rules of Criminal Procedure, if a discovery violation occurs:

> the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 305(E). The trial court has broad discretion in choosing the appropriate remedy for the discovery violation. *Commonwealth v. Rodgers*, 500 Pa. 405, 412, 456 A.2d 1352, 1355 (1983). A defendant seeking relief from the discovery violation must demonstrate prejudice in order to be entitled to a new trial. *Id.*

Here, the trial court, when presented with the violation, ordered that appellant receive a complete copy of the letter which he himself wrote so that it could be reviewed by his counsel. (N.T. 6/2/93 at 155). Clearly, such a remedy lies within the court's discretion under Rule 305(E). *See Commonwealth v. Gordon*, 364 Pa.Super. 521, 540, 528 A.2d 631, 640–41, *appeal denied*, 517 Pa. 621, 538 A.2d 875 (1987) (defendant's request for dismissal of charges properly denied when trial court ordered disclosure of report so that defendant could review and use report in trial after short recess, especially when defendant knew of report's existence prior to trial). Also, appellant fails to show that the trial court abused its discretion by ordering this remedy and he fails to show that he was prejudiced by this remedy. This Court will not speculate as to whether the Commonwealth's failure to disclose the letter caused prejudice, particularly where as here, appellant knew of the letter he wrote before trial; the trial

court did not admit the letter or its contents into evidence; and, the trial court limited the Commonwealth's usage of the letter during Pletcher's re-direct. Moreover, appellant's failure to request a continuance when the full letter was disclosed leads the Court to conclude that no prejudice was suffered because one can infer from the failure to request a continuance that no additional time or strategy was needed to prepare for the limited usage which the trial court placed on the Commonwealth in rehabilitating Pletcher. Thus, we find that the trial court did not abuse its discretion. Accordingly, this claim is rejected.

Appellant's fifth claim is that the trial court erroneously denied appellant's motion for a mistrial after Margaret Cobaugh fainted in front of the jury as she exited the courtroom after completing her testimony about appellant's attempted rape of her and appellant's statement regarding the victim. The determination of whether to grant a motion for a mistrial rests within the sound discretion of the trial court. *Commonwealth v. Hawkins*, 448 Pa. 206, 219, 292 A.2d 302, 309 (1972). Appellate courts will not readily find an abuse of discretion if the trial court moves expeditiously to correct any prejudicial effect which a courtroom event may have on the jury. *Id.*

Here, Ms. Cobaugh fainted as the jurors were leaving the courtroom for a brief recess. The trial judge immediately ordered the sheriff to remove the jurors as soon as he noticed Ms. Cobaugh faint. When the jurors returned, the trial judge stated:

"Before we begin, just to let you know that the witness that passed out, is okay, she's on her way home."

(N.T. 6/3/93 at 175).

Appellant contends a mistrial should have been ordered because this incident created great feelings of sympathy in the jury for Ms. Cobaugh which unfairly prejudiced him to the point that no jury could reach an impartial verdict. However, this incident is certainly less damaging than conduct in other cases where we have concluded that the denial of a motion for

a mistrial was proper since no prejudice resulted from that conduct. *See Hawkins, supra.* (mistrial not warranted where midway through defense counsel's closing, murder victim's brother stood up and shouted "He murdered him. You are a bum."); *Commonwealth v. Glover,* 446 Pa. 492, 495, 286 A.2d 349, 351 (1972) (mistrial not warranted where police officers began laughing in courtroom during defense counsel's opening address to jury). Moreover, given the brevity of the incident, the quickness in which the trial court removed the jurors, and the promptness of the trial court in informing the jurors that Ms. Cobaugh was doing fine and on her way home, we find that appellant suffered no prejudice from this incident. Thus, the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Accordingly, this claim must fail.

Appellant's sixth claim is that the trial court erred in allowing Margaret Cobaugh to testify that during his attempted rape of her, he threatened: "if you open your mother fucking mouth, you'll get the same thing Anna Knaze got." Appellant claims this evidence should not have been admitted because his statement to her was inadmissible hearsay, and, her testimony about the context in which the statement was made was inadmissible testimony regarding prior bad acts with which he was charged at the time of the trial.

As to the admission of appellant's threatening statement, it is a general rule that voluntary extrajudicial statements made by a defendant may be used against a defendant even though they contain no admission of guilt. *Commonwealth v. Tervalon,* 463 Pa. 581, 590, 345 A.2d 671, 676 (1975). As this Court explained in *Tervalon:*

> These extrajudicial statements, which differ from confessions in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for introduction into evidence under the admission exception to the hearsay rule.

*Id.*

Here, appellant voluntarily made the statement to Cobaugh while he attempted to rape her. The statement shows that

appellant had a peculiar knowledge as to the victim's murder since it was made approximately fourteen (14) hours before she was found dead in her house. Thus, this admission implied that appellant was the victim's murderer because of this peculiar knowledge. Accordingly, the trial court properly admitted appellant's statement to Margaret Cobaugh into evidence.

As to the context of the statement, the admission into evidence of prior bad acts is within the sound discretion of the trial court and can only be reversed upon a showing that the court abused its discretion. *Commonwealth v. Banks*, 513 Pa. 318, 350, 521 A.2d 1, 17 (1987). While it is true that evidence of distinct crimes is inadmissible if offered to merely prejudice the defendant by showing him to be a person of bad character, we have recognized that such evidence may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). Such evidence is admissible when it tends to prove a common scheme, plan or design, malice, absence of mistake or accident, motive, or intent for the offense charged. *Commonwealth v. Jones*, 499 Pa. 522, 526, 454 A.2d 8, 10 (1982); *Commonwealth v. Green*, 488 Pa. 611, 616–17, 413 A.2d 651, 654 (1980). Furthermore, our courts will allow evidence of other crimes when it tends to establish the identity of the person charged with the commission of the crime or where it was part of the chain or sequence of events which formed the history of the case and formed part of the natural development of facts. *Commonwealth v. Lark*, 518 Pa. 290, 302, 543 A.2d 491, 497 (1988); *Green, supra.*

Here, the statement which appellant made to Margaret Cobaugh while he attempted to rape her completed the story of the murder by demonstrating the history and natural development of the facts surrounding appellant's movements on the day of the murder. The completion of the story was extremely relevant since it helped the jury understand that appellant had peculiar knowledge of the murder and that appellant was the perpetrator of the crime. Thus, the admis-

sion of the circumstances under which the statement was made was admissible and this claim must fail.

■ Appellant's next claim is that the trial court abused its discretion in not granting his pre-trial motion for a continuance of the murder trial until after he was tried for the attempted rape of Margaret Cobaugh. A denial of a pre-trial motion for a continuance will only be disturbed on appeal if the trial court has abused its discretion. *Commonwealth v. Scott,* 469 Pa. 258, 263–64, 365 A.2d 140, 142–43 (1976). In a criminal case, the appellate court should look to the nature of the crime and the surrounding circumstances to determine if the denial of a continuance was an abuse of discretion. *Scott,* 469 Pa. at 264, 365 A.2d at 143. At the outset, it is significant to note that appellant directs the court to the transcript for the April 2, 1993 hearing on this motion for three of the reasons he believes the trial court abused its discretion. While this is improper, the relaxed waiver rule for capital cases requires us to examine this issue. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■ Appellant first argues that a continuance should have been granted since it could lead to inconsistent verdicts between the rape charge and the murder charge. However, appellant is apparently confused in making this argument because the murder charge was always scheduled to be tried separately from the rape charge. This Court's concerns over inconsistent verdicts only applies to cases in which the allegedly inconsistent verdicts arose in the same trial. *See e.g., Commonwealth v. Strand,* 464 Pa. 544, 546, 347 A.2d 675, 676 (1975); *Commonwealth v. Carter,* 444 Pa. 405, 282 A.2d 375 (1971). The desire for consistency mainly arises where the same evidence is used to support each count for which defendant is charged and where each count requires the same elements to support a conviction. *See* 4 Wharton's Criminal Procedure (12th Ed.) at §§ 574–75. In the present case, no such concerns are present. Thus, the possibility of inconsis-

tent verdicts has nothing to do with this case. Therefore, this argument has no merit.

Appellant also argues that a continuance should have been granted because he does not believe that his attempted rape of Margaret Cobaugh was admissible. As described above, we believe that this evidence was admissible since it was the natural history or circumstance relating to appellant's statement regarding the victim. Thus, this argument has no merit.

Appellant further argues that a continuance should have been granted because his incriminating statement would not have been admissible if he were acquitted of the rape charge. As discussed above, this argument must fail since the statement is admissible under this Court's ruling in *Tervalon* regardless of the status of his rape charge. Thus, this argument has no merit.

Finally, in order to support his argument that the trial court abused its discretion in denying his continuance motion, appellant asks this Court to consider an event which happened after the trial court denied his continuance motion on April 5, 1992. In particular, appellant claims that the police reports regarding the attempted rape of Margaret Cobaugh were not turned over to appellant until May 28, 1993, a few days before trial began. Appellant asserts that if a continuance had been granted, he would not have been surprised by the contradictions contained in the two police reports regarding the rape and he could have had more time to prepare a defense on this issue.[11] The use of hindsight is improper since the trial court's discretion should be measured by the facts before it when the motion was decided. It was impossible for any of the events which occurred after the April 5, 1992 order to have been before the court at that time it decided the motion. Moreover, our review of the record as it existed at the time the motion was decided does not show that the trial court abused its discretion. Accordingly, appellant's

11. In a separate issue which is examined below, appellant contends that the trial court erred when it did not allow appellant to introduce a May 6, 1992 police report made to Officer Yvonne Krug by Margaret Cobaugh regarding the rape.

claim based on the denial of his pre-trial continuance motion must fail.

■ Appellant next claims that the trial court erred in permitting the admission into evidence of a photograph of appellant in a boxing stance without his shirt on because it was not relevant. Moreover, appellant asserts that even if the photograph was relevant, it still was error to admit the photograph since its relevance was outweighed by its prejudicial nature of showing a young black male posing in a combative stance.

■ The admissibility of photographs in homicide cases lies within the discretion of the trial judge, and only an abuse of discretion will constitute reversible error. *Commonwealth v. Rompilla*, 539 Pa. 499, 653 A.2d 626, 630 (1995). The basic rule that evidence is admissible if it is relevant and competent applies equally to photographs. *Commonwealth v. Schroth*, 479 Pa. 485, 489, 388 A.2d 1034, 1036 (1978). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. Spiewak*, 533 Pa. 1, 8, 617 A.2d 696, 699 (1992).

Here, the autopsy showed that the victim's spine was severed and that all of her ribs were broken. Dr. Mittal, the person who performed the autopsy, testified that these injuries may have been inflicted by someone punching the victim. The trial court admitted the photograph of appellant in a boxing stance with his shirt off because it found that it was relevant to appellant's physical ability to inflict the injuries upon the victim. While we are not convinced that the photograph was admissible, we find that the photograph, showing a young, clean-cut male in good physical condition in a boxing stance, does not rise to the level of what we consider so inflammatory or prejudicial as to warrant a new trial. *See Commonwealth v. Biebighauser*, 450 Pa. 336, 346–48, 300 A.2d 70, 75–77 (1973) (Court believed that trial court should have excluded photographs of nude body of deceased because they

had little evidentiary value, however, admission did not constitute reversible error since defendant suffered no prejudice); *Commonwealth v. Ly*, 528 Pa. 523, 532, 599 A.2d 613, 617 (1991) (admission of evidence must have resulted in an "incurable" prejudice). Accordingly, we conclude that a new trial is not warranted as a result of the trial court's admission of this photograph of appellant into evidence.

Appellant's next claim is that the trial court erroneously prohibited appellant from impeaching Margaret Cobaugh's credibility by not admitting into evidence a May 6, 1992 police report of Officer Yvonne Krug (the "earlier report"), the officer to whom Cobaugh initially reported the rape. Appellant claims that this earlier report contained information that conflicted with Cobaugh's October 9, 1992 police report and trial testimony. Specifically, appellant claims that the earlier report stated that Cobaugh did not see her attacker's face and that the attacker did not say anything about the murder victim.

It is well established that prior inconsistent statements are admissible as substantive evidence and for impeachment purposes. *Commonwealth v. Brady*, 510 Pa. 123, 130–31, 507 A.2d 66, 71 (1986) (use of prior inconsistent statements of a non-party witness who was present in court and subject to cross-examination as substantive evidence allowed); *See also, Commonwealth v. Baez*, 494 Pa. 388, 394, 431 A.2d 909, 912 (1981) (use of prior inconsistent statements of a non-party witness in court and subject to cross-examination allowed for impeachment purposes). The prior inconsistent statements that may be used as substantive evidence are limited to statements: (1) that have been given under oath at a formal legal proceeding; (2) that have been reduced to a writing and signed and adopted by the witness; or, (3) that are a contemporaneous verbatim recording of the witness's statement. *Commonwealth v. Lively*, 530 Pa. 464, 470, 610 A.2d 7, 10 (1992).

Here, the earlier report was not given under oath. During cross-examination, appellant's counsel read each prior incon-

sistent statement contained in the earlier report to Cobaugh and inquired whether Cobaugh remembered making each statement. In essence, this was an attempt by appellant's counsel to have Cobaugh adopt the statements in the earlier report. Even though this attempt failed because Cobaugh denied making the statement or stated that she could not remember making the statement, appellant's counsel still attempted to move the earlier report into evidence. Since the earlier report was neither given under oath nor signed and adopted by Cobaugh, the earlier report would only have been admissible if appellant demonstrated that it was a contemporary, verbatim record of her statement.[12] However, no evidence was offered that the earlier report was such a contemporaneous, verbatim recording. Officer Krug did not testify at trial about the earlier report or Cobaugh's statements because she was on vacation and had not been subpoenaed before she left for vacation. Thus, the earlier report which contained prior inconsistent statements was inadmissible as substantive evidence.

As for impeachment based on prior inconsistent statements, "[I]t is axiomatic that when attempting to discredit a witness' testimony by means of a prior inconsistent statement, the statement must have been made or adopted by the witness whose credibility is being impeached." *Id.* A written report which is only a summary of the words of the victim and not verbatim notes from the victim cannot be used to impeach the witness on cross-examination since it would be unfair to allow a witness to be impeached on a police officer's interpretation of what was said rather than the witness' verbatim words. *See Commonwealth v. Bailey,* 322 Pa.Super. 249, 264, 469 A.2d 604, 612 (1983); *Commonwealth v. Pinder,* 310 Pa.Super. 56, 63, 456 A.2d 179, 183 (1983); *Commonwealth v. Hill,* 267 Pa.Super. 264, 269–70, 406 A.2d 796, 799 (1979).

As previously discussed, appellant's counsel did not present any admissible evidence that Cobaugh made the statements in the earlier report and was unable to show that Cobaugh ever

12. The Commonwealth stipulated to the police report's authenticity, but not to its probative value or veracity. (N.T. 6/4/93 at 23).

adopted the statements in the earlier report or that the earlier report contained her verbatim statements. Thus, the earlier report which contained prior inconsistent statements was not admissible to impeach Cobaugh. Accordingly, the trial court did not err in ruling that the prior inconsistent statements contained in the earlier report were inadmissible as substantive evidence or for impeachment purposes.

 Assuming *arguendo* that it was error for the police report to have been excluded from evidence, no new trial is warranted since any resulting error is harmless. Here, the trial court granted appellant considerable leeway in cross-examining Cobaugh since it allowed him to read each prior inconsistent statement and inquire whether Cobaugh recalled making those statements to Officer Krug. (N.T. 6/3/93 at 168–171). Cobaugh either denied making the statement or stated that she could not remember making the statement. In essence, this had the effect of putting the inconsistencies on the record and in front of the jury. Also, any error was harmless since the trial court ruled that appellant could argue those inconsistencies to the jury and appellant did argue the inconsistencies during closing argument. (N.T. 6/4/92 at 29, 69–76). Thus, we find that any error in precluding the prior inconsistent statements in the May 6, 1992 police report was harmless. Accordingly, this claim must fail.

 In his final allegation of error, appellant argues that the prosecutor committed prosecutorial misconduct by making two improper remarks during his closing argument at trial and by making one improper remark during his closing argument during the penalty phase. In reviewing a claim of improper prosecutorial comments, our scope of review is limited to whether the trial court abused its discretion by ruling that the Commonwealth did not act improperly. *Commonwealth v. D'Amato*, 514 Pa. 471, 490, 526 A.2d 300, 310 (1987). Generally, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not

weigh the evidence objectively and render a true verdict. *Commonwealth v. D'Ambro,* 500 Pa. 303, 309–10, 456 A.2d 140, 144 (1983).

▪ The first closing statement at trial which appellant contends was improper was when the prosecutor referred to Margaret Cobaugh's testimony as follows:

Ladies and gentlemen, for you to disbelieve the testimony of Margaret Cobaugh, you would have to conclude that she wrote, produced and directed that entire episode that you saw here yesterday afternoon, testimony that literally drained everything out of her body.

Now, yesterday, when your eyes were swelling and tears were running down your cheeks, is that how you evaluated it is she made it all up for some evil purpose? Or did you realize what that lady had gone through and going through to stand there and point to that man, that is him, that is the man.

(N.T. 6/4/93 at 98).

▪ It is well settled that as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth witness. *Commonwealth v. Barren,* 501 Pa. 493, 498–99, 462 A.2d 233, 235 (1983). This is especially true when the credibility of the witness has been previously attacked by the defense. *Id.*

Here, the prosecutor did not assert his personal opinion as to Margaret Cobaugh's testimony. Instead, the prosecutor commented on Margaret Cobaugh's general demeanor and credibility. These comments were especially proper since appellant: (1) constantly attacked Margaret Cobaugh's credibility during her cross examination (N.T. 6/3/93 at 135–173); (2) solely dedicated its case-in-chief to impeaching her testimony that she called for an ambulance for her neighbor just before appellant attempted to rape her (N.T. 6/4/93 at 6–20); [13]

13. As discussed previously, Cobaugh testified that she had called an ambulance for a friend having breathing difficulties approximately ten to fourteen hours after the victim's murder, and that upon returning to her home, appellant attempted to rape her. Appellant tried to impeach

248

and (3) during closing, attacked the inconsistencies in her testimony and suggested that her testimony was a fabrication caused by suggestions made to her by the police. (N.T. 6/4/93 at 69–75). *See Barren, supra* (prosecutor's statement that "When Helen (the victim) got up there she had to go through this ordeal because she wanted to bring you the truth, what actually happened," was proper to bolster credibility of rape victim whose credibility was attacked by defense). Moreover, these comments did not have the unavoidable effect of prejudicing appellant by inflaming the jury or by forming a fixed bias or hostility in the jury's minds toward the defendant so that they could not weigh the evidence objectively. Thus, this claim of prosecutorial misconduct must fail.

The other closing statement at trial which appellant contends was improper was the prosecutor's paraphrasing of what Margaret Cobaugh testified appellant said to her when he attempted to rape her. During closing, the prosecutor stated: "Now we have all that but we have one more thing. We have Ernest Simmons' own words. Shut your fuckin' mouth or I will do to you what I did to Anna Knaze." (N.T. 6/4/93 at 97). Margaret Cobaugh, however, testified that appellant said: "If you open your Mother Fucking mouth, you'll get the same thing Anna Knaze got." (N.T. 6/3/93 at 117).

A prosecutor's remarks must be evaluated for possible prejudicial effect in the context in which they occur. *Commonwealth v. Carpenter*, 533 Pa. 40, 48–49, 617 A.2d 1263, 1267 (1992). Here, a review of the record does not show that the prosecutor's paraphrasing or misquotation of Margaret Cobaugh's testimony was deliberate. *See Commonwealth v. Brown*, 489 Pa. 285, 298–99, 414 A.2d 70, 77 (1980) (misstatement of fact by prosecutor in closing that defense counsel was formerly an Assistant District Attorney did not constitute error or warrant a new trial since evidence did not show that misstatement was deliberately done). Any prejudicial effect

her testimony in order to disprove the timing of the alleged rape and comment by appellant regarding the victim.

from the misquote was cured by the trial court's general cautionary instruction to the jury before closing arguments that none of the closing arguments constituted evidence and that it was bound solely by its recollection of the facts. (N.T. 6/4/94 at 30–31). *See Commonwealth v. Talley,* 456 Pa. 574, 578, 318 A.2d 922, 924 (1974) (any prejudice from prosecutor's closing remarks overcome by trial court instructing jury that they are sole finders of fact). Thus, since the misquote appears to have been inadvertent and the trial court properly instructed the jury on its role as fact finder, we conclude that this claim of prosecutorial misconduct must fail. Moreover, the errors in the prosecutor's statement were harmless since they merely paraphrased in a minor way what the rape victim had testified that appellant had said to her.

▇ Finally, appellant contends that the following remarks during the prosecutor's closing at the penalty phase were improper:

> After you deliberate upstairs and you come down here, let your verdict ring out. Make it very clear to Mr. Simmons that you are going to protect society. Death is for sure, but just how long is life? Be sure, ladies and gentlemen. The penalty should be death.

(N.T. 6/5/93 at 50). After appellant's objection to this statement, the trial court, with agreement of all counsel, gave the following limiting instruction:

> Ladies and gentlemen, we have had an objection from defense counsel as to comments by the prosecuting attorney and I am going to make the following instruction to you, that the term life imprisonment means nothing more than life imprisonment. You can't make any other inference from that.

(N.T. 6/5/93 at 52).

▇ A prosecutor may normally not inject considerations of parole into the penalty hearing. *Commonwealth v. Floyd,* 506 Pa. 85, 95, 484 A.2d 365, 370 (1984).[14] However, we find

---

**14.** The injection of parole is more serious and plainly prejudicial if the prosecutor also speculates as to what a defendant might do if released

250

that the trial court's explicit curative instruction cured any confusion that may have been caused by the prosecutor's statement that suggested that "life" imprisonment does not mean life imprisonment.[15] Accordingly, this last claim of prosecutorial misconduct also fails.

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).

After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. In addition, we further find that each of the three aggravating factors found by the jury which are specified in 42 Pa.C.S. § 9711(d) are

from jail. *Commonwealth v. Clayton*, 516 Pa. 263, 284, 532 A.2d 385, 396–97 (1987) (not improper statement by prosecutor since it did not refer to what defendant would do if released and reference to parole was in response to argument made by defendant's counsel at closing); *See also Commonwealth v. Hall*, 523 Pa. 75, 90–91, 565 A.2d 144, 152 (1989) (prosecutor remark "give him life, so he can get paroled one day and kill somebody else ..." was improper); *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984) (improper remark by prosecutor since he explicitly referred to possible parole and that Floyd would kill again if released since he was a "predator"); *Commonwealth v. Aljoe*, 420 Pa. 198, 208–09, 216 A.2d 50, 55–56 (1966) (improper remark where prosecutor specifically mentioned eligibility for parole and that defendant could commit crime if released). However, the prosecutor made no such remarks in this case.

**15.** Such an instruction would not be necessary under *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), since a jury must only be informed that defendant is ineligible for parole when the prosecution puts the future dangerousness of defendant at issue and state law prohibits release on parole for a capital defendant.

supported by the record. Specifically, the jury found that appellant killed his victim during the course of a felony, 42 Pa.C.S. § 9711(d)(6). This was supported by the jury's return of a guilty verdict on the robbery charge in this case. The jury also found that the manner in which appellant carried out this murder supported the aggravating circumstance that the killing was committed by a means of torture, 42 Pa.C.S. § 9711(d)(8). In the instant case, the evidence established that the victim, in addition to being manually strangled, also had all twelve pairs of her ribs broken and that her spine was severed. Finally, the jury found the aggravating circumstance that appellant has been convicted of other felonies involving the threat or use of force, 42 Pa.C.S. § 9711(d)(9). During the penalty phase, evidence was admitted that on April 15, 1985, appellant pleaded guilty to robbery in connection with the taking of $100 and car keys from a seventy-eight year old male victim on August 13, 1984. Also, appellant pleaded guilty on April 15, 1985 to robbery and aggravated assault in connection with the taking of $45 and the beating of a seventy (70) year old man on August 23, 1984. This evidence clearly proved 42 Pa.C.S. § 9711(d)(9).

Furthermore, in accordance with *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 961 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), we have reviewed the sentencing data compiled by the Administrative Office of the Pennsylvania Courts pertaining to similar cases and conclude that the sentence of death imposed upon appellant is not disproportionate to the sentences imposed in similar cases. *See Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 707–08, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant, Ernest Simmons, by the Court of Common Pleas of Cambria County.[16]

16. The Prothonotary of the Supreme court is directed to transmit, as soon as possible, the complete record of the case *sub judice*, including the record of trial, sentencing hearing, imposition of sentence and

252

ZAPPALA and CAPPY, JJ., concur in the result.

MONTEMURO, J., is sitting by designation.

review by this Court to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).