J-S44007-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
   :        PENNSYLVANIA
   :
       v.    :
   :
   :
   :
DENNIS TINSEL    :
   :
       Appellant    :    No. 772 EDA 2017

Appeal from the Judgment of Sentence January 27, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008735-2015,
CP-51-CR-0008737-2015, CP-51-CR-0008749-2015,
CP-51-CR-0008751-2015, CP-51-CR-0008753-2015,
CP-51-CR-0008755-2015, CP-51-CR-0008757-2015

BEFORE: LAZARUS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:             **FILED JULY 27, 2018**

Dennis Tinsel (a.k.a. Dennis Tindal), appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after a jury convicted him of seven counts each of aggravated assault,[1] attempted murder,[2] and possessing instruments of crime,[3] as well as one count of criminal conspiracy to commit murder.[4] Following the recording of the verdict,

---

[1] 18 Pa.C.S. § 2702(a)(1).

[2] 18 Pa.C.S. § 901(a).

[3] 18 Pa.C.S. § 907.

[4] 18 Pa.C.S. § 903(c).

the trial court found Tinsel guilty of possession of a firearm.[5]  Upon careful

review, we affirm.

The trial court summarized the relevant facts as follows:

[On June 22, 2015, on the 700 block of East Hilton Street in the
Kensington section of Philadelphia,] multiple gunshot blasts
emanate[ed] from a sawed-off shotgun being wielded by Keith
Warren.  As Warren marched down the street he was seen by []
Basil Elliott, who immediately fled toward F Street.  Warren began
firing the shotgun in Elliott's direction, completely disregarding the
children playing on E. Hilton Street that day.  Basil Elliott was shot
in his liver and kidney.  In addition, ten-year-old Dale Koch, three-
year-old[] Yesenia Nieves and nine-year-old[] Katrina Vega, were
shot while playing in an inflatable pool situated on the sidewalk.
Christina Koch, Dale and Yesenia's mother, was struck with a
shotgun blast as she [] rushed to shield the children.  [] Shawn
Jones was shot in the back of his head while fleeing, and Anthony
Miles was shot in the back of his neck[,] fracturing it.

Warren fled while still holding the black shotgun with the pistol
grip . . . [A]s he ran toward Madison Street after [the shooting]
on Hilton Street, he was seen running through a vacant lot located
at G and Madison Street by a local delivery man, Nestor Nieves.

[] Nieves, who worked for a beverage company and was visiting
a customer in the area, was driving by E. Hilton Street when he
heard several gunshots.  He then saw people scrambling a couple
of blocks away after which he parked near his customer's
business.  While sitting in his car, he saw [] Warren running in his
direction[.]  Warren was carrying a shotgun and had nothing
covering his face.  [] Nieves then observed Warren run north on
G Street and then turn onto Madison Street where he ran through
a vacant lot.

[] Nieves gave a statement to police describing what he observed.
During the interview, [] Nieves took part in a photo identification
session during which he identified a photograph of [] Warren.  He
stated that he was "95 to 98%" sure that the photograph he

---

[5] 18 Pa.C.S. § 6105.

identified depicted the male he saw running on the afternoon of the shooting.

Numerous police officers and emergency medical personnel rushed to the scene to care for the multiple victims, all of whom were rushed to a nearby hospital. Police searched the area and collected numerous pieces of ballistic evidence including the shotgun, which was found in the abandoned lot at the corner of G and Madison Streets. Police traced the shotgun to Devin Tindal (hereinafter Devin), [Dennis Tinsel's] brother.

Devin testified that [Tinsel] sold drugs in the area of G and Hilton Streets and had done so for ten years. Devin also testified that on March 1, 2012, [Tinsel] had him illegally purchase a shotgun and ammunition. Devin identified the shotgun recovered by police at G and Madison Streets as the weapon he purchased for [Tinsel]. Devin never again saw the shotgun after he purchased it for [his brother].

In late June, 2015, Devin received a telephone call from [Tinsel] during which [Tinsel] asked him to lie to the police. Specifically, [Tinsel] asked Devin to tell police that [Devin's] identification was stolen during a robbery that occurred a couple of years prior thereto in the area of G and Hilton Streets and that the person who robbed him used Devin's identification to purchase the shotgun. Devin refused and [Tinsel] told him that he had to lie to the police because he ([Tinsel]) used the "joint," i.e. the shotgun Devin had purchased, [and if Devin told them this,] the police would not come looking for him. [Tinsel] also told Devin that the gun had been left "in the lot." Devin told [Tinsel] that he planned to tell the truth.

On July 1, 2015, Devin gave police a statement [alleging] that he purchased a shotgun for his brother. He also told police that [Tinsel] called him a few days prior thereto about the purchase of the shotgun and asked him to lie. He also gave police the names of several persons, including Sara[h] Reyes, [Tinsel's] paramour. Devin told police that he believed that the shotgun was being stored at [] Reyes' home.

[] Reyes, a long-time resident of the 700 block of Hilton Street in Philadelphia, came to know [Tinsel] because he ran one of two competing drug dealing operations on Hilton Street and came there every day to sell drugs. At some point she entered into an intimate relationship with him. During the relationship, [] Reyes

was introduced to [Tinsel's] co-defendant [] Warren, who [Tinsel] said was his cousin.[6]

In June, 2015, the relationship between [] Reyes and [Tinsel] became strained because [Tinsel] and [] Reyes' twenty-six-year-old daughter Charlene began "messing" around. On or about June 20, 2015, Warren's sister attempted to fight [] Reyes' daughter Emily, because she believed that Emily had revealed that Charlene and [Tinsel] were in a relationship.

On June 22, 2015, at about 10:00 a.m., [] Reyes was outside when [Tinsel] arrived in his truck and parked on G Street. [Tinsel] walked to Hilton Street where he shook the hand of a male [] Reyes knew by the name "Gooch," who was standing with a group of other males. A second male, specifically Basil Elliott, walked up and the group began berating [Tinsel] about [] having [] his cousin [(Warren)] beat up [] Reye[s'] daughter. The conversation soon turned violent as Gooch, Elliott, and another male named Reese began punching [Tinsel]. During the incident, [] Reyes saw Reese pull out a gun and hit [Tinsel] in the head[,] prompting [] Reyes to scream, "Stop." The men stopped beating [Tinsel], who fled to his truck yelling, "I'll be back[,]" before driving away. [] Reyes observed [Tinsel] bleeding from his head.

After [Tinsel] left, [] Reyes went home and told Charlene what [] happened to [Tinsel]. At about 1:30 p.m., Warren and another male came to her home and her daughter spoke to them out of [] Reyes' earshot. At about 2:30 p.m., [] Reyes was in her kitchen when she heard three or four loud "booms" outside that sounded like firecrackers, prompting her to look out her front door. When she did so, she saw Warren carrying a shotgun. Warren looked at her and then ran toward G Street. [] Reyes also saw that a man she knew as "Fingers" was lying on the ground and was bleeding from his neck. She got some towels to stop the bleeding.

[] Reyes thereafter went outside and heard several persons talking about what [] happened. Police arrived shortly thereafter but [] Reyes did not speak to them that day. Subsequent thereto, Philadelphia Police Detective Kenneth Rossiter came to her home to interview her. During the interview, she told the detective about the problems she was having with [Tinsel] and identified a photograph of him[.] [Reyes] gave an incorrect description of

---

[6] Tinsel and Warren are not biological cousins.

Warren and did not give [the detective] Warren's name because she was afraid for her family's safety.

[Later,] Reyes went to a police station and told police that Warren, who she called "Cuz," was the person she saw shooting on June 22, 2015. She thereafter identified photographs of Warren that were in a photo array and photos developed from a video recording of the incident.

[] Alena Abramova, [Tinsel's] fiancé[e], received a telephone call from [Tinsel] on June 22, 2015, during which [he] told her that he had been attacked. In a text, [] Abramova asked [Tinsel] to promise that he would not do anything "to get hurt more." [Tinsel] responded with, "it's already done."

According to [] Abramova, [Tinsel] did not come home the night of the shooting or pick up his son[,] which was out of the ordinary. She further stated that [Tinsel] owned a shotgun, which he said was in his brother Devin's name, and that she heard that he kept a shotgun in her home[.] [This same firearm] had been thrown in an alley located at G Street and Allegheny Avenue.

During the evening on the day of the incident, [Tinsel also] sent [] Abramova a text telling her to get rid of everything in a cabinet situated over the refrigerator. When [] Abramova asked him when he would be home, [he] said, "Soon[,]" and "This shit got big." Over the next few days, [] Abramova received more texts from [Tinsel] and spoke to him. During those contacts, he asked if she had seen anything "funny" around the house, discussed switching cars to evade the people who had attacked him, requested that she remove bullets from a suit jacket pocket and discard them, and delete all of his texts and phone logs. [Tinsel] also said that his brother Devin had spoken to police and had indicated that he was moving. [Tinsel] also stated, "do you think I was going to get jumped on the block and no one was going to do something about it?"

Over the course of the . . . weeks after the incident, [Tinsel] did not stay overnight at [] Abramova's house, which was out of the ordinary. [He] turned himself in on July 7, 2015.

Detective James Dunlap of the Philadelphia Police Department's Homicide Unit conducted a search of the records pertaining to [Tinsel's] cell phone. The records reflected that [his] cell phone was within two square miles of the area where the shooting occurred [at the time of the incident]. Also, immediately following

the shooting, [Tinsel's] cell phone travelled from Philadelphia to New York City. It returned to Philadelphia the following day, but not to the vicinity of [] Abramova's residence or G and Hilton Streets, locations where the phone records indicated it spent the most amount of its time every day prior to the incident.

Trial Court Opinion, 7/31/17, at 2-7 (internal citations omitted).

In November of 2016, Tinsel filed a motion *in limine* to exclude evidence that alleged he was a drug dealer who "ran the block" where the shooting took place. The trial court denied this motion in part, allowing the Commonwealth to introduce evidence of Tinsel's history as a drug dealer in the area; this testimony developed the Commonwealth's theory of the case that the shooting on June 22 occurred as retaliation for Tinsel being beaten earlier that morning. Following trial, a jury convicted Tinsel of the above charges. After the recording of the verdict, the trial court additionally found Tinsel guilty of possession of a firearm. On January 27, 2017, Tinsel was sentenced to an aggregate term of incarceration of one-hundred five to two-hundred ten years.

Following sentencing, Tinsel filed a post-sentence motion, which the trial court denied. Thereafter, Tinsel filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement. On appeal, he presents the following issues for our consideration:

1. Was the evidence sufficient to support [Tinsel's] convictions where the Commonwealth failed to establish [he] conspired with or otherwise abetted [c]o[-]defendant [Warren] in the shooting?

2. Did the [t]rial [c]ourt abuse its discretion in allowing the Commonwealth to introduce[] evidence of [Tinsel's] alleged criminal activity unrelated to the instant matter?

Appellant's Brief, at 2.

Tinsel first argues that the evidence was insufficient to support his conviction for conspiracy to commit murder,[7] his convictions under a theory of accomplice liability,[8] and his convictions where the Commonwealth "merely offered motive evidence." Appellant's Brief, at 9, 14, 17.

Our standard of review for sufficiency of the evidence claims is well-settled:

> The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict . . . When reviewing the sufficiency of the evidence, [this Court] must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offence beyond a reasonable doubt.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1235-37 (Pa. 2007) (internal citations omitted) (emphasis in original). "The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder[,] unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." ***Commonwealth v. Stokes***, 38 A.3d 846, 853 (Pa. Super. 2011) (internal citations omitted).

---

[7] 18 Pa.C.S. § 903(a)(1).

[8] 18 Pa.C.S. § 306(b)(3).

A person is guilty of conspiracy if "with the intent of promoting or facilitating its commission he . . . agrees with such other person . . . that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." 18 Pa.C.S. § 903(a)(1). Thus, to prove conspiracy to commit murder, the Commonwealth must demonstrate an agreement between individuals, a shared criminal intent, and an overt act done in furtherance of the conspiracy. *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa. Super. 1998). The defendant need not commit the overt act himself; a co-conspirator may do so. *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002). Additionally, the Commonwealth must prove that "the defendant shared the criminal intent, i.e., that the [defendant] was an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." *Id.* at 1016 (internal citations omitted). As explicit agreements in this context rarely arise, "proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Johnson*, *supra* at 785.

Tinsel argues the trial court erred in finding the evidence sufficient to sustain a conviction for criminal conspiracy. Specifically, Tinsel argues that he himself did not commit any overt act, that the testimony establishing a connection between him and Warren was attenuated, and that the Commonwealth did not produce evidence of "any agreement, or even communication," between him and Warren. Appellant's Brief, at 12-13. Tinsel's argument fails on several grounds. First, as stated, explicit

agreements are rarely found in such instances, and therefore conspiracy may be inferred from circumstantial evidence. Here, even if attenuated, the connection between Warren and Tinsel was demonstrated at trial. Even without evidence tying Warren to Tinsel's drug dealing enterprise, Tinsel referred to Warren as his cousin, and Warren fired a shotgun belonging to Tinsel, in an area where Tinsel was mugged hours before. A reasonable jury could, and in fact did, conclude that the relationship between the two suggested an agreement with shared criminal intent. **Stokes**, **supra**. Further, it is well-established that actions by a co-conspirator taken while acting in furtherance of the conspiracy can be attributed to a defendant. **Lambert**, **supra**. Here, Warren's actions on Hilton Street would constitute that overt act.

Next, Tinsel contends the evidence was insufficient to convict him on the theory of accomplice liability. An accomplice is someone who, "with the intent of promoting or facilitating the commission of the offense aids or agrees or attempts to aid another person in planning or committing the crime." **Lambert**, **supra** at 1024 (internal citations omitted). "The criminal intent necessary to establish accomplice liability is identical to the criminal intent necessary to establish conspiracy." **Commonwealth v. Hennigan**, 753 A.2d 245, 254 (Pa. Super. 2000). Because the evidence was sufficient to find Tinsel guilty of conspiracy, his argument regarding accomplice liability is meritless.

Tinsel next argues that the evidence was insufficient to sustain all of his convictions "where the Commonwealth merely offered motive evidence."

- 9 -

Appellant's Brief, at 17.  Tinsel essentially argues that, because other parties involved in the matter had motives of their own, his conviction cannot stand.  The trial court deduced:

> In addition[,] the evidence outlining [Tinsel's] actions and admissions prior to and following the incident was more than sufficient to prove [Tinsel's] guilt and participation in the crime beyond a reasonable doubt.  Not only did [he] make a threat after he was beaten, following that beating, he, *inter alia*: 1) admitted to his fiancé[e] that he could not let the incident pass and that "it" had already happened; 2) asked his brother to lie about the purchase of the shotgun because it had been "used,"; 3) fled to New York; 4) altered his usual schedule; and 5) asked his fiancée to collect and discard bullets and other items.  Given this evidence, it is clear that the Commonwealth presented enough circumstantial evidence in addition to the evidence of motive to prove [Tinsel's] guilt beyond a reasonable doubt.

Trial Court Opinion, 7/31/17, at 9.  We agree.  This argument is legally and factually unfounded and meritless.

Lastly, Tinsel challenges the admission of testimony about his activities as a drug dealer, because it was "unconnected to the proffered motive and crime for which [he] was standing trial."  Appellant's Brief, at 18.  The "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion."  ***Commonwealth v. Reese***, 31 A.3d 708, 716 (Pa. Super. 2011).  "For a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party," such that the trial court's error could have effected the verdict in the case.  ***Commonwealth v. Tyack***, 128 A.3d 254, 257 (Pa. Super. 2015).

- 10 -

Evidence of a person's character is inadmissible to "prove that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(a). However, an exception for character evidence allows its admission in order to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2); *see also Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009). This Court has held that "the trial court must decide first if the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect." *Commonwealth v. Serge*, 896 A.2d 1170, 1177 (Pa. 2006) (internal citations omitted). Evidence admissible under Rule 404(b) is not limited to prior convictions, but also extends to prior wrongs and acts. *Commonwealth v. Lockcuff*, 813 A.2d 857, 861 (Pa. Super. 2002). Particularly,

> our courts will allow evidence of other crimes when it tends to establish the identity of the person charged with the commission of the crime or where it was part of the chain or sequence of events which formed the history of the case and formed part of the natural development of facts.

*Commonwealth v. Simmons*, 662 A.2d 621, 635 (Pa. 1995).

The evidence in question was elicited to demonstrate Tinsel's identity and motive. The record shows that Reyes knew Tinsel as a drug dealer on the block where the shooting occurred. The Commonwealth relied upon this evidence to establish its theory of the case that Tinsel "ran the block,"

maintained a presence in the area, and sought to control the area in order to run his drug dealing business. The trial court found:

> Thus, the admission of the evidence . . . was a necessary part of the story, as it provided context as to why [Tinsel] believed it necessary to retaliate after he was attacked, to add substance and meaning to why he was always on the block[], and to explain why he had his brother make a straw purchase of the shotgun for him.

Trial Court Opinion, 7/31/17, at 16. Further, the trial court concluded that the probative value of the evidence in assisting the jury to understand the full story of the incident outweighed its prejudicial effect. *Id.* We agree with this assessment. The trial court did not abuse its discretion in admitting the evidence of Tinsel's identity as a drug dealer, which allowed the jury to infer that he had a motive to coordinate this shooting.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/27/18

- 12 -