J-A20020-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| LARS MATTHEW RINDAHL | : | |
| | : | |
| Appellant | : | No. 378 WDA 2021 |

Appeal from the PCRA Order Entered March 4, 2021
In the Court of Common Pleas of Clarion County Criminal Division at
No(s):  CP-16-CR-0000093-2018

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: JANUARY 31, 2022**

Appellant, Lars Matthew Rindahl, appeals from the order dismissing his timely petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  After careful review, we reverse the order and remand for a new trial.

The Commonwealth provided a comprehensive summary of the facts that led to Appellant's underlying conviction for rape,[1] involuntary deviate sexual intercourse,[2] statutory sexual assault,[3] and indecent assault,[4] as follows:

_____

[1] 18 Pa.C.S. § 3121(c) (rape of a child).

[2] 18 Pa.C.S. § 3123(b) (involuntary deviate sexual intercourse with a child).

[3] 18 Pa.C.S. § 3122.1 (11 or more years older than the complainant).

[4] 18 Pa.C.S. § 3126(a)(7) (victim less than 13 years of age).

In 2013[,] Appellant was dating a woman named Cheyenne Hetrick. The victim, S.M.[,] is Ms. Hetrick's younger sister. Prior to December of 2013[,] Appellant and S.M. had a good relationship which was described as being "like siblings" and "normal boyfriend[,] little sister." [N.T.,] 8/30/2018[,] at 29[,] 65. In December of 2013[,] Ms. Hetrick and Appellant picked up S.M. from her father's house. *Id.* at 26, 66[,] 120. S.M. testified that while at her father's house[,] Appellant "was massaging our feet at that time, and he like - after he was done massaging our feet, he like slip[ped] his hand up to my butt. And I kept like trying to put it back on my ankle." *Id.* at 26-27. After leaving S.M.'s father's home[,] the three went to Wal-Mart to get movies and food and then traveled to the home shared by Ms. Hetrick and Appellant in Lickingville, PA. *Id.* at 27-28, 66[,] 120. At some point a woman named Taryn call[ed] and sp[oke] to Ms. Hetrick. *Id.* at 30, 67[,] 120-[]21. At this point[,] the version of events differs significantly between S.M. and Ms. Hetrick's version[,] and Appellant's.

S.M. testified that her sister received a phone call from Taryn after the three of them had watched several movies[,] including Polar Express and Wrong Turn 5. Ms. Hetrick and Appellant had gone to their bedroom at that time. *Id*[.] at 29-30. S.M. and Ms. Hetrick both testif[ied] that S.M. did not accompany Ms. Hetrick to go and see Taryn. *Id.* 30[,] 67-68. Ms. Hetrick testified that she was gone anywhere from 45 minutes to a couple of hours[,] although she did not have a specific recollection of how long she was gone. *Id.* at 68. S.M. testified that about 30 minutes after her sister [left]…[,] Appellant came out of his room. *Id.* at 31. He began to massage her feet and was traveling up her leg farther. *Id.* She did not remember how far his hand went "massaging-wise[,]" but [she did] recall him saying[,] "[t]his can go the easy way or the hard way." *Id.* S.M. testified that he then "put his fist between my shoulder blades, and he put his arm under my waist and lifted me up and ripped my shorts off" and then "raped me in the butt." *Id.* She d[id] not recall[] whether he ejaculated, how long it lasted, or if he said anything else. *Id.* at 32-33. She testified that she never verbally protested because she was "kind of afraid." *Id.* at 33. She testified that after she was raped[,] Appellant went into his room and returned with a pair of her "sister's leggings" and gave them to her[,] which she put on. *Id.* at 32. When Ms. Hetrick returned home[,] she testified that she noticed that S.M. was wearing a pair of her black leggings with a red top. *Id.* at 68[,] 79.

Appellant's version of events is quite different. He testified that after Taryn called Ms. Hetrick[, Taryn] came to their house. *Id.* at 120. He testified that[,] while there[,] Ms. Hetrick, S.M.[,] and Taryn were having "girl talk" while he stayed "mostly in the bedroom." *Id.* at 120-[]21. He testified at one point[,] they ordered wings from a local restaurant[,] and Ms. Hetrick and Taryn went to pick them up. *Id.* at 121. He [stated] that they were gone for 10-15 minutes "at the most[,]" during which time he remained in his bedroom separated from S.M. *Id.* 122-[]23. He did not testify to any other time that evening [when] Ms. Hetrick would have left. *Id.* 123-[]24. He testified that he went to sleep and never went back into the living room. *Id.* at 124. He denied that he ever raped or sexually assaulted S.M. in any way.

S.M. testified that she did not disclose to her sister what happened when she returned home or the next morning because "[]he was in the room right next to us[," and because Appellant "]made her happy." *Id.* at 33. A few months [later, S.M.] told a teenager named Ashley that Appellant had touched her. *Id.* [at] 34. She did not provide the full detail[s] or her allegation that Appellant had raped her…. *Id.* [at] 34-35. This information eventually made its way back to her mother[,] who questioned her about it. *Id.* at 34-35[,] 92-93. S.M. and her mother both testified that she was sobbing when questioned and[,] when asked if anything else happened[,] she replied "no." *Id.*

By mid-2014[,] Appellant and Ms. Hetrick had broken up, and it was undisputed that Appellant and S.M. had no contact with each other beyond that point. S.M. testified that the first person she told that Appellant raped her was her friend[,] Tytus Hartzell. *Id.* at 35. [Hartzell] testified that he was told by S.M. that she was raped by her sister's ex-boyfriend[,] [Appellant,] at their house. *Id.* at 82. Based on his timeframe of when he was told[,] it was likely in 2015.

S.M.'s disclosure eventually reached the authorities following an October 2016 admission to the "psych ward" after "the doctor kept asking [S.M.] questions, and at that point, [she] just kind of broke down and told him." *Id.* at 35. After her discharge from the hospital[, S.M.] flew to Florida to live with her mother. S.M.'s mother had been alerted by law enforcement prior to S.M.'s arrival that something had happened between Appellant and her. *Id.* at 94. Upon returning to Florida her mother questioned her again

and "[t]hat's when she broke down again and said [Appellant] raped me, Mom." *Id.*

After December of 2013[,] S.M., Ms. Hetrick[,] and her mother all testified that S.M. had changed. Ms. Hetrick testified that after December 2013[,] S.M. was "really angry[,"] "didn't want to be anywhere near [Appellant,]" and "the whole thing changed." *Id.* at 69. S.M.'s mother testified that S.M. was "angry all the time," she wouldn't cuddle anymore, she would be startled if anyone was behind her, and she was "shut down."

Commonwealth's Brief at 1-6 (footnote omitted).

As further noted by Appellant, he was the only defense witness called to testify at his trial, and S.M.'s claims were not directly corroborated by any eyewitnesses.[5] Appellant's Brief at 12-13. Nevertheless, a jury convicted him of the above-mentioned offenses following a trial that began on August 30, 2018. On October 3, 2018, the trial court sentenced Appellant to 20-40 years' incarceration for rape, a concurrent term of 2-4 years' incarceration for statutory sexual assault, and to no further penalty at the remaining counts. The trial court denied Appellant's timely-filed post-sentence motion on October 16, 2018. Appellant did not file a direct appeal.

_____

[5] That is, consistent with S.M.'s testimony, there were no other persons present who observed the rape apart from Appellant and S.M., and thus there was no **direct** corroboration of the sexual assault. However, Ms. Hetrick, S.M.'s mother, and Hartzell each testified to some extent in a manner that tended to boost S.M.'s credibility in light of her delayed reporting of the assault. For instance, Ms. Hetrick's testimony largely corroborated S.M.'s version of events on the evening of the rape, but for the specific criminal acts alleged, which Ms. Hetrick did not witness. Furthermore, Ms. Hetrick and S.M.'s mother testified to an abrupt change in S.M.'s demeanor around the time of the alleged rape, consistent with S.M.'s own testimony. Additionally, Hartzell testified to an earlier disclosure by S.M.

On October 25, 2018, Appellant filed a *pro se* PCRA petition, at which time his trial attorney, Eric Spessard, Esq., simultaneously filed a motion to withdraw as counsel. On November 5, 2018, the court granted counsel's motion to withdraw, and denied Appellant's *pro se* PCRA petition, as his judgment of sentence had not yet become final when the petition was filed.[6]

On November 12, 2019, Appellant filed the timely, counseled PCRA petition ("Petition") currently under review, wherein he alleged multiple claims that his trial attorney provided ineffective assistance of counsel ("IAC"). A PCRA hearing was held on July 16, 2020, where Appellant called Attorney Spessard and four potential character witnesses to the stand. Additionally, a stipulation was entered into evidence that six additional witnesses would have given similar testimony to that of the four testifying character witnesses.

On November 18, 2020, the PCRA court entered an order and opinion denying the Petition. Appellant filed a motion to reconsider, which was untimely granted by the PCRA court on December 29, 2020. Anticipating a problem due to the PCRA court's delay in responding to his motion to reconsider, Appellant filed a notice of appeal on December 15, 2020, which was docketed at 1344 WDA 2020. Ultimately, during that appeal, the trial court informed this Court that it had failed to timely grant Appellant's motion for reconsideration due to COVID-19-related staffing issues. Consequently,

---

[6] Appellant's judgment of sentence became final 30 days after his post-sentence motion was denied on October 16, 2018. Thus, Appellant's judgment of sentence became final on November 15, 2018.

we remanded for the PCRA court to enter a new order following reconsideration of its denial of the Petition, and we also relinquished our jurisdiction. *See* Order Granting Appellant's Application for Remand, 1/29/21, at 1.

On remand, the PCRA court entered an order and opinion on March 4, 2021, again denying the Petition. Appellant filed a timely notice of appeal from that order on March 22, 2021. He then filed a timely, court-ordered Pa.R.A.P. 1925(b) statement, and the PCRA court issued a Rule 1925(a) statement on April 6, 2021. In its Rule 1925(a) statement, the PCRA court indicated that its previous opinions, filed on November 18, 2020 and March 4, 2021, adequately set forth its reasons for denying the Petition.

Appellant now presents the following questions for our review:

1.  This sexual assault case was a credibility battle between [Appellant] and his accuser. [Appellant's] trial counsel provided ineffective assistance because he failed to offer good character evidence from several family members and a pastor. Indeed, this issue is directly controlled by *Commonwealth v. Weiss*[, 606 A.2d 439 (Pa. 1992)]. Did the PCRA court err when it dismissed [Appellant's] petition?

[2].  As [Appellant's] trial counsel conceded, trial counsel provided ineffective assistance because he failed to effectively impeach the accuser with her prior inconsistent statements. Did the PCRA court err when it dismissed [Appellant's] PCRA petition?

Appellant's Brief at 4.

We review an order dismissing a PCRA petition

in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling

- 6 -

if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (internal citations omitted).

Both questions presented for our review are IAC claims, which we review under the following general standards:

To prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements: (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness. With regard to the second, reasonable basis prong, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if [the a]ppellant proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective.

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1127–28 (Pa. 2011) (cleaned up).

In his first issue, Appellant argues that Attorney Spessard provided IAC by failing "to offer good character evidence from several family members and a pastor who were willing and able to provide it[,]" especially because the

- 7 -

conflict between Appellant's and S.M.'s credibility was of paramount importance to the jury's verdict. Appellant's Brief at 19-20. Appellant maintains that this case is "directly controlled" by our Supreme Court's decision in **Weiss**, and that he is entitled to a new trial on that basis. Our

> Supreme Court has determined that the failure to call character witnesses does not constitute *per se* ineffectiveness. It is axiomatic that when a PCRA petitioner claims counsel was ineffective for failing to call a witness, he or she must establish (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

**Commonwealth v. Goodmond**, 190 A.3d 1197, 1202 (Pa. Super. 2018) (cleaned up).

Here, the PCRA court determined that Appellant "satisfied the first four prongs of the ineffectiveness test for failure to call witnesses" under **Goodmond**, **supra**. PCRA Court Opinion, 11/18/20, at 11 ("PCO1"). Indeed, as recounted by Appellant,

> ten character witnesses attended the PCRA hearing. Four testified in open court. The six remaining witnesses testified by stipulation. Two additional witnesses who lived out of state could not attend the hearing, but did co-author a letter confirming [Appellant's] reputation. That letter, prepared by [Appellant's] maternal aunts, was submitted into evidence as Exhibit E-5. Thus, the defense proffered a total of twelve character witnesses, including eleven separate family members.

Appellant's Brief at 26-27. Furthermore, as found by the PCRA court, each of the four testifying witnesses indicated that "they were never asked to testify

- 8 -

[at trial], but they would have been available and done so" had they been asked by Attorney Spessard. PCO1 at 11. Thus, the only issue that remained for the PCRA court's consideration under **Goodmond**, **supra**, was whether the absence of the proposed reputation testimony denied Appellant a fair trial.[7]

The PCRA court concluded that Appellant was not denied a fair trial, as he "cannot establish prejudice because the proposed testimony does not constitute proper character evidence." **Id.** In this regard, the court reasoned that:

> The proposed testimony of [Appellant]'s relatives is not admissible character evidence because they described only their own experiences and opinions, the opinions of other family members, and what a handful of non-family members had told them. They only described [Appellant]'s reputation in the "community" of their extended family.

**Id.** at 16-17.

Although the witnesses could speak to Appellant's reputation for certain character traits[8] within his extended family or church congregation, the PCRA

---

[7] **See also** Commonwealth's Brief at 11 (stating "it cannot be contested that the first 4 elements have been met").

[8] The Commonwealth argued before the PCRA court and continues to maintain that Appellant's proposed character testimony is inadmissible on the basis that Appellant's reputation for peacefulness and non-violence were not pertinent to any issue at trial because "it did not need to prove that [Appellant] was violent or used force to commit the criminal acts." **Id.** at 18. Even though none of the elements of the charges at trial required proof of a violent act, the PCRA court rejected the Commonwealth's argument because there "was evidence of violence" used to accomplish the criminal acts as established by S.M.'s testimony. **Id.** at 19. Thus, the court concluded that "appropriate
*(Footnote Continued Next Page)*

court determined that none of the proposed witnesses could speak to Appellant's "general reputation in any of the communities in locations where he has lived[,]" noting Attorney Spessard's testimony that Appellant "lived in many different places" and "had bounced around frequently." *Id.* at 17. Consequently, the PCRA court found that Attorney Spessard was not ineffective for failing to call these witnesses because he had "made a proper inquiry of" Appellant, from which he concluded that there was no "**admissible** character evidence" to offer on Appellant's behalf at trial. *Id.* (emphasis added).

In its opinion rejecting Appellant's motion for reconsideration, the PCRA court expounded on its reasoning, indicating that it was relying on a combination of the law and facts of this case in determining that "the extended family[,] … church congregation[,] and friends the witnesses described do not constitute a 'community' pursuant to Pa.R.E. 404(a) and 405(a)." PCRA Court Opinion, 3/3/21, at 4 ("PCO2"). The court denied having ruled "that an extended family or a church congregation can never be a 'community.'" *Id.* Instead, the court indicated that it was following precedent that established

_____

testimony of a general reputation for peacefulness and non[-]violence would have been competent evidence." *Id.* We agree with the PCRA court. The Commonwealth's only direct evidence of the criminal acts in question stemmed from S.M.'s testimony, which unambiguously involved the allegation that Appellant anally raped her by use of at least some force. Thus, Appellant's reputation for non-violence/peacefulness was directly related to the credibility of the Commonwealth's most critical evidence at trial, even though the Commonwealth was not specifically required to prove an act of violence to secure a conviction.

that a 'community,' for purposes of admitting reputation evidence, must be "more than a few individuals." *Id.* Upon review of the record, the court determined that each of the witnesses' purported community reputation evidence had only instead conveyed evidence of Appellant's reputation among a few individuals. *Id.* at 5. Additionally, the PCRA court determined that significant portions of the witnesses' testimony was inadmissible as community reputation evidence because the reputation was meant to be inferred from specific acts, that is, from Appellant's prior good conduct in the community. *Id.* at 5-7.

Appellant argues the PCRA court erred in determining that the witnesses failed to present proper character reputation evidence. Regarding the court's finding that Appellant's witnesses only testified as to his reputation for peacefulness and non-violence among a few individuals, Appellant retorts:

> This finding is flat wrong. At the PCRA hearing, [Appellant] did not simply offer the "personal opinion of a few people" about [Appellant]. On the contrary, [Appellant] offered ten witnesses who testified that [Appellant] had a reputation in the community for being peaceable and non[-]violent.

Appellant's Brief at 46.

Appellant further avers that, "[a]ccording to the evidence of record, the communities that hold [Appellant] in high regard consist not only of the twelve people who specifically vouched for [his] good reputation in this case, but also [Appellant's] larger communities of extended family and church members." *Id.* at 47-48. He continues:

> To offer some specific examples, Daniel Larkin testified that among the "community of extended family" members, [Appellant]

has a "reputation for being, in fact, a non[-]violent, peaceable person." Erika Rindahl testified that within their shared community of extended family, [Appellant] has a "reputation in [that] community as being non[-]violent." And Nancy Larkin testified by stipulation that [Appellant] "did not have a reputation in the community" for being violent. This testimony constituted proper character evidence under Pa.R.E[]. 803(21), which allows the accused in a criminal case to offer evidence of his "reputation … in the community concerning [his] character."

In its opinion, the PCRA court also repeatedly emphasized that just "a few" or "even a handful" of people cannot comprise a community. Assuming for argument's sake that this statement is true, so what. According to the evidence of record, the communities that hold [Appellant] in high regard consist not only of the twelve people who specifically vouched for [his] good reputation in this case, but also [Appellant's] larger communities of extended family and church members. While unnecessary, to offer an example of a specific number of community members, one of [Appellant's] character witnesses – his grandfather[,] Daniel Larkin – testified that the extended family community he shares with [Appellant] includes Mr. Larkin's daughters, grandchildren, and great grandchildren. Mr. Larkin further explained that all told[,] he has eighty-one (81) children, grandchildren, and great grandchildren. Eighty-one people is a lot more than a "few" or "a handful."

*Id.* at 46-48 (footnotes omitted).

Appellant also relies heavily on *Weiss*, which he asserts is directly on point. In *Weiss*, the defendant was granted a new trial based on his attorney's failure to call character witnesses. *Weiss*, 606 A.2d at 441. In that case, Weiss and his wife had separated. *Id.* Their daughter, the victim, occasionally stayed with Weiss. *Id.* Weiss's daughter testified at his trial that Weiss sexually assaulted her on one of those occasions. *Id.* She further asserted that Weiss pointed a gun at her when she screamed. *Id.* A few days later, after the victim had returned to her mother's home, the mother

discovered a cut near her vagina. *Id.* A physician testified that the cut was consistent with the daughter's assertion that, while assaulting her, Weiss had "cut her vaginal area with a plastic knife." *Id.* The victim also had a torn hymen, which was "consistent with physical penetration, but not necessarily limited to physical penetration." *Id.* Furthermore,

> [t]he defense's case consisted principally of the testimony of [Weiss], who vehemently denied the accusations, [Weiss]'s two roommates who corroborated [his] testimony, and two children of one of [Weiss]'s roommates who testified that they had occasionally seen [Weiss] and the victim in bed together. One child testified that on either November 15 or 16, 1985, she and the victim had gone to sleep on the sofa bed, but when she awoke the next morning[,] the victim was in [Weiss]'s bed. She could not recall whether [Weiss] was at home at the time. [Weiss]'s father testified to a recantation by the victim. No character witnesses were called on [Weiss's] behalf….

*Id.*

Following his conviction, Weiss claimed on appeal that his trial counsel was ineffective for failing to call character witnesses. At a post-verdict hearing, he

> offered the testimony of several character witnesses in support of his claim that trial counsel was ineffective for failing to present evidence of [his] good character, and failing to present evidence of [his] wife's bad character. In addition to [Weiss]'s employer and co-worker, these witnesses included numerous friends and relatives. Notably, [Weiss's] wife's parents and brother testified to [Weiss]'s good character reputation and his wife's lack thereof. All of the witnesses testified that they would have been willing to testify at trial on [Weiss]'s behalf had they been asked by [his trial] attorney.

*Id.* at 442.

- 13 -

Weiss's trial attorney interviewed some, but not all, of the character witnesses whom Weiss had proposed, and he "did not contact any witnesses until the day before trial." *Id.* at 443. Weiss's trial attorney did not contact any of Weiss's family members for character evidence because he believed such evidence to be worthless, which ultimately "precluded him from assessing their credibility." *Id.*

In reviewing the claim of the attorney's ineffectiveness, the *Weiss* Court first determined that there was arguable merit to the assertion because:

> In a case such as this, where there are only two direct witnesses involved, credibility of the witnesses is of paramount importance, and character evidence is critical to the jury's determination of credibility. Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty.

*Id.* at 442.

Next, addressing counsel's reasoning for failing to call character witnesses on Weiss's behalf, the Court determined that his decision "was not a tactical one made after weighing all of the alternatives, but was based on the fact that he had failed to interview and prepare potential character witnesses, and consult with his client thereto." *Id.* at 443. Furthermore, as to the family members who were willing and able to offer character evidence, the *Weiss* Court held that, "[a]lthough familial character witnesses generally lack the credibility of unbiased non-familial witnesses, an attitude that they are *per se* worthless[] is sufficient evidence of counsel's incompetency." *Id.*

Consequently, the Court found "no reasonable basis to support trial counsel's decision not to call any character witnesses." ***Id.***

Turning to the prejudice element of the test for counsel's ineffectiveness, the ***Weiss*** Court reasoned as follows:

> Counsel's stated strategy was not to contest the physical findings of sexual abuse, but to focus on the fact that it may have been [Weiss]'s wife, not [Weiss,] who "set the whole thing up." It would have been entirely consistent as well as highly beneficial, in light of this strategy, to present character witnesses, who not only would vouch for [Weiss]'s good character, but would have impeached his wife's character at the same time.

> Whereas the defense did not attempt to refute the physical findings, the evidence regarding the perpetrator boiled down to [Weiss]'s word against the word of his wife and daughter. The only issue then, was whether [Weiss] or someone else was responsible for what happened. Considering there was no overwhelming evidence of guilt in this case, credibility of the witnesses was of paramount importance, and counsel's error not to employ character witnesses, familial or otherwise, undermined [Weiss]'s chances of instilling reasonable doubt in the minds of the jury and resulted in prejudice to appellant.

***Id.*** (citation and footnote omitted).

Here, the Commonwealth agrees with the PCRA court that Appellant ostensibly failed to proffer admissible reputation evidence, arguing that "[a]ll of the character testimony, both in court and th[r]ough stipulation is … littered with personal experience, specific instances of conduct, and personal opinion. This type of testimony is antithetical to the requirements of proper character evidence." Commonwealth's Brief at 23. Alternatively, even if Appellant's proposed character evidence were admissible, the Commonwealth contends that ***Weiss*** does not create a "*per se* ineffectiveness test for failure to call

familiar character witnesses as Appellant seems to suggest[.]" *Id.* at 24. The Commonwealth argues that *Weiss* is distinguishable on factual grounds, contending that the "character witnesses in this case lack the overwhelmingly powerful nature of those in *Weiss*." *Id.* at 27. The Commonwealth avers that Appellant's

> character witnesses were not testifying contrary to [what] one would expect, as in *Weiss*. Rather[,] they are proposed to testify as one would expect a family member to testify, that is in support of their loved one. Finally, none of the[] character witness … offered … would impugn the reputation of S.M., Ms. Hetrick, S.M.'s mother, or Tytus Hartzell[,] like the witnesses in *Weiss* would have done.

*Id.* at 28. Thus, the Commonwealth maintains that Appellant was not so prejudiced by the absence of the at-issue character evidence to warrant relief.

We first address the admissibility of the at-issue evidence. If the proposed witnesses' character reputation evidence were ultimately inadmissible at trial, Appellant could not have been prejudiced by Attorney Spessard's failure to call them to the stand. The PCRA court essentially found that Appellant's proposed witnesses did not offer community reputation evidence at all, but instead only presented evidence of his reputation among a few individuals in his family and their testimony as to specific instances where he conformed to that reputation.

Although character evidence is generally inadmissible "to prove that on a particular occasion the person acted in accordance with the character or trait[,]" Pa.R.E. 404(a)(1), Rule 404(a)(2)(A) provides the exception that "a defendant may offer evidence of the defendant's pertinent trait[.]"

- 16 -

As this Court has stated:

> "It has long been the law in Pennsylvania that an individual on trial for an offense against the criminal law is permitted to introduce evidence of his good reputation in any respect which has 'proper relation to the subject matter' of the charge at issue." ***Commonwealth v. Luther***, 463 A.2d 1073, 1077 (Pa. Super. 1983). Evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all the evidence presented in the case on the general issue of guilt or innocence. ***Id.*** Evidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. ***Id.*** In a case where the crime charged is one of violence, evidence of reputation for non-violent behavior is admissible. ***Id.***

***Commonwealth v. Harris***, 785 A.2d 998, 1000 (Pa. Super. 2001) (citations reformatted).

Rule 405 governs the admissibility of character evidence. Character evidence may be proven through reputation evidence, ***see*** Pa.R.E. 405(a), however, specific instances of conduct are generally "not admissible to prove character or a trait of character." Pa.R.E. 405(b). Furthermore, such evidence must be relevant to the time-period surrounding the act in question, "and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor." ***Luther***, 463 A.2d at 1077–78 (quoting ***Commonwealth v. Boone***, 354 A.2d 898, 904 (Pa. 1975)).

"Community" is not a term found in Rules 404 or 405, and it is not otherwise defined in Pennsylvania's Rules of Evidence. Furthermore, the limited, existing caselaw addressing the term does not set specific contours of

what constitutes a 'community' for purposes of determining the admissibility of reputation-of-character evidence. However, the parties and the PCRA court all agree that a 'community,' for purposes of reputation-of-character evidence is, at a minimum, composed of more than a few individuals. The PCRA court determined that Appellant failed to present character witnesses capable of testifying to his reputation in the community because they only spoke to his reputation among a few individuals in his family and church communities, or only spoke to their personal experiences with Appellant. We agree with Appellant that this conclusion is simply belied by the record.

We first note that the PCRA court did not make any adverse credibility ruling regarding the truthfulness of the PCRA hearing witnesses' testimony. The Commonwealth further stipulated to the content of the testimony of several more potential family witnesses, each of whom intended to testify as to Appellant's reputation in the community of his extended family, consistent with the testifying witnesses. Thus, the PCRA court's factual conclusions that these witnesses each failed to offer testimony as to Appellant's reputation in a sufficiently large community was not due to any defect in credibility. Rather, each witness testified as to Appellant's reputation in his extended family, which the court determined to be too small for purposes of reputation evidence.

However, the fact that Appellant proffered no fewer than ten family members willing to testify as to his reputation in his extended-family community facially belies the notion that the at-issue community of

- 18 -

Appellant's extended family was not sufficiently large to sustain reputation evidence. Certainly, ten witnesses alone constitutes more than 'a few individuals.' In any event, their testimony explicitly reflected knowledge of Appellant's reputation among more than merely a few individuals.

For instance, Appellant first presented the testimony of Daniel Larkin, his grandfather. *See* N.T., 7/16/20, at 88-100. Larkin, a missionary, testified that he and his extended family had discussed Appellant's charges. *Id.* at 91-92. He indicated that Appellant had a reputation in that community as being non-violent. *Id.* at 92. On cross-examination, Larkin indicated that he came to this opinion about Appellant's reputation for non-violence in part because of Larkin's direct interactions with Appellant, but also because "if anything happens in that small community, everybody knows about it." *Id.* at 94. When asked if that reputation was something the family discussed, Larkin answered, "Yes, yes. Our family has – they would state whatever it was." *Id.* at 95. Elaborating, he stated that Appellant "always had the reputation of being non[-]violent." *Id.* On redirect, Larkin stated that this opinion not only stemmed from his own personal dealings with Appellant, but from his conversations with other members of the extended family who confirmed his belief regarding Appellant's reputation for non-violence. *Id.* at 99.

Erika Rindahl, Appellant's sister, testified that she grew up with Appellant, and that, later as adults, they again lived together for about three years. *Id.* at 101-02. She stated that their social circles overlapped, and so she knew many of Appellant's friends and girlfriends. *Id.* at 103. However,

she testified primarily as to her knowledge of Appellant's reputation in their extended family. *Id.* at 104. She stated that they had a "large family" that was "close[,]" and that it included not only her immediate family, but also "grandparents, aunts, [and] uncles." *Id.* She indicated that her family members discussed Appellant's charges and "were all very shocked" by them, because Appellant had a reputation for being non-violent. *Id.* at 105-06.

Reverend Chris Hill, a pastor at the Free Methodist Church in Oil City where Appellant's father had previously pastored, also testified. *Id.* at 110. Reverend Hill stated that Appellant and Cheyenne Hetrick were members of his congregation while they were dating. *Id.* at 111. In addition to knowing Appellant as a parishioner, Reverend Hill and his wife also conducted individual counseling with Appellant and Ms. Hetrick. *Id.* Reverend Hill testified that Appellant's reputation in Hill's "church community" was one of non-violence based on his interactions with members of that community. *Id.* at 112-13.

The last witness to testify was Reverend Terrence Kelley, Appellant's stepfather. *Id.* at 118. Appellant was seven when Reverend Kelley began raising him and his sister, Erika. *Id.* at 119. Reverend Kelley testified that he was present during the previously referenced conversations about Appellant's reputation among his extended family. *Id.* at 121. After indicating his personal opinion of Appellant's character, *see id.* at 121-22,[9] Kelley was

---

[9] The PCRA court did not expressly sustain the Commonwealth's objection to Reverend Kelley's opinion based on his personal experience, but the court clearly directed the witness to refrain from such testimony following the Commonwealth's objection. *Id.* at 122.

specifically asked what Appellant's reputation was in the "community of family members…." *Id.* at 122. He answered that Appellant had a reputation for being "non[-]violent." *Id.* He was then asked whether the "foundation" of that belief was "that other people shared [his] opinion" of that reputation for non-violence. *Id.* Reverend Kelley answered in the affirmative. *Id.* at 123.

During cross-examination, the Commonwealth asked Kelley whether his testimony about Appellant's reputation for non-violence was based on his "personal experience … with him[.]" *Id.* at 127. Kelley answered that it was based on his "personal and surrounding experience of [his] family and community." *Id.* Kelley elaborated that, other than the allegation for which Appellant was tried, he had never heard of Appellant of being violent. *Id.* When questioned further about his conversations "with people about [Appellant's] character and his reputation in the community," Kelley answered:

> It's hard for me to define what you're asking me. I mean, people didn't just come to me and say, [Appellant] is really non[-]violent or anything like that. What they did was, they commented to me about how gentle and how easygoing he is, girlfriends wanted … to marry … him, you know, things like that. They loved him and had conversations, you know, with girls and things like that. That's what I'm talking about in the community. No one has come to me and said, boy, he hit me or he did anything aggressively, abusively, or anything like that. I have not experienced that, and that's what I mean as far as community. That's from friends and neighbors, and I'm talking of violence, you know.

*Id.* at 128.

During redirect examination, the following exchange occurred:

- 21 -

Q. Just to make sure I understand the foundation of your opinion, you spoke to other family members in anticipation of this hearing, and they also indicated that they believed he was non[-]violent?

A. Yes, yes.

Q. And the family that we're describing in the community includes extended family, grandparents, things of that nature?

A. That's correct.

*Id.* at 129.

Finally, the parties stipulated to the proposed testimony from several other witnesses who would have testified "consistent with the witnesses" who had testified in person. *Id.* at 130. The witnesses included Nancy Larkin, who co-wrote a letter submitted into evidence that she wrote with her husband, Daniel Larkin. *Id.* Bjorn Larkin, Appellant's brother, would have testified consistent with Erika Rindahl's testimony. *Id.* Bethany Kelley, Appellant's mother, would have testified consistent with Reverend Kelley's testimony. *Id.* at 131. Carmen Meade and Esther Vogan, Appellant's aunts, would have testified as to Appellant's reputation for non-violence, consistent with a letter admitted into evidence that they co-wrote with two additional aunts. *Id.* Finally, Kelsey Kelley, Reverend Kelley's biological daughter, would have testified "consistent with the other witnesses about [Appellant's] reputation in the community of family members for being non[-]violent." *Id.*

This record does not support the PCRA court's factual conclusion that the reputation evidence concerned only the opinions of a few individuals about the relevant character trait of non-violence. Thus, the court's related legal conclusion that the community was not sufficiently large to sustain reputation

- 22 -

testimony was erroneous. Furthermore, although some of the witnesses at times offered inadmissible personal opinions regarding Appellant's character or specific instances of him behaving nonviolently, they **additionally** proffered evidence of Appellant's reputation in the community of Appellant's extended family. Although this evidence concerned Appellant's reputation in a relatively small community, it easily exceeded the opinion of merely a few individuals, and it did not consist solely of the personal observations and experiences of the witnesses regarding Appellant's character.

This character evidence must "be regarded as evidence of substantive fact just as any other evidence tending to establish innocence" and could have been "considered by the jury in connection with all the evidence presented in the case on the general issue of guilt or innocence." *Harris*, 785 A.2d at 1000. Thus, the PCRA court's conclusion—that the trial counsel's failure to present this otherwise-available reputation evidence at Appellant's trial did not prejudice him because that evidence would have been inadmissible on the basis that it only concerned Appellant's reputation among just a few individuals—is both contrary to the record and legally erroneous.

Nevertheless, the mere existence of admissible evidence of Appellant's reputation for non-violence not utilized by Attorney Spessard at trial does not automatically entitle Appellant to a new trial. That is, trial counsel was not *per se* ineffective for failing to call these character witnesses, and we agree with the Commonwealth that *Weiss* does not hold to the contrary. However,

we disagree with Commonwealth's further argument that **Weiss** does not support Appellant's claim for relief in the specific circumstances of this case.

The Commonwealth argues that **Weiss** is distinguishable because:

The character witnesses in the instant case lack the overwhelmingly powerful nature of those in **Weiss**. In **Weiss**[,] the jury had to decide whether in the midst of a "bitter custody battle" a child's mother or father caused injury to her genitals. It could have been the child's father, in which case he was guilty. It could have been the child's mother manipulating law enforcement and the courts in an attempt to win the custody battle. Thrust into this situation are the victim's grandparents[,] who would testify positively of their son-in-law[,] the accused rapist, and negatively against their own flesh and blood. **Weiss** was a "who done it" not a "did it happen." In the instant case[,] the facts are markedly different. There was no custody dispute. In fact, S.M. had not seen Appellant for a number of years prior to disclosing the rape, and Ms. Hetrick had been separated from him for over a year prior to disclosure. The character witnesses were not testifying contrary to as one would expect, as in **Weiss**. Rather they are proposed to testify as one would expect a family member to testify, that is in support of their loved one. Finally, none of these character witness[es] were offered … [to] impugn the reputation of S.M., Ms. Hetrick, S.M.'s mother, or Tytus Hartzell, like the witnesses in **Weiss** would have done.

Commonwealth's Brief at 27-28.

We are unconvinced by the Commonwealth's argument. First, the Commonwealth's attempt to draw a distinction between did-it-happen and who-done-it cases is not the proper frame of analysis and, therefore, ultimately irrelevant. In both **Weiss** and the instant matter, there were no other eyewitnesses beyond the victim and the perpetrator. In both cases, the conflicting testimony suggested that the allegation was either truthful or manufactured. In neither case was there the slightest suggestion regarding

- 24 -

the possibility of an unknown perpetrator—in both cases, the alleged perpetrator was well known to the victim. Thus, in both cases, there was a 'he said/she said' credibility battle that was the essential matter for the jury to resolve in reaching a verdict.

While it is true that there were undisputed injuries to the victim's vaginal area in **Weiss**, that physical evidence tended to corroborate the victim's accusation. Here, by contrast, there was no physical evidence tending to corroborate the victim's accusation. The absence of similar corroborative physical evidence in this case increases the potential impact of reputation testimony. Additionally, in **Weiss**, the assault was immediately reported by the victim, whereas the victim in this case did not report the assault until several years after it happened.

We agree with the Commonwealth that the reputation evidence considered in **Weiss** was potentially more powerful in one respect, as it spoke to the poor reputation of the victim and her mother in **Weiss**, whereas the at-issue testimony here did not additionally impugn the character of the Commonwealth's witnesses. However, we conclude that, considered altogether, the circumstances in this case suggest that **at least** as much prejudice resulted from trial counsel's failure to call witnesses as had occurred in **Weiss**, given the corroborative evidence of the victim in **Weiss** that was simply absent here. Thus, to the extent that **Weiss** is factually distinguishable from the case *sub judice*, the facts here suggest a greater potential impact of reputation evidence, not less, contrary to the Commonwealth's arguments.

Finally, we consider the Commonwealth's reliance on ***Commonwealth v. Van Horn***, 797 A.2d 983 (Pa. Super. 2002). Van Horn was convicted of numerous sexual offenses for the "assault of his daughter's [minor] son over a period of at least two years." ***Id.*** at 986. In that case, as here, the defendant argued that his trial counsel was ineffective for failing to call several family members to attest to his character, and the only question that remained was whether Van Horn was prejudiced by counsel's failure to call those witnesses at trial. The ***Van Horn*** Court ultimately determined that Van Horn "failed to establish that the absence of his relatives' testimony was so prejudicial as to require a new trial." ***Id.*** at 987–88. The ***Van Horn*** Court reasoned as follows:

> With regard to the relatives' desire to testify that [Van Horn] had a good relationship with the victim and that [Van Horn] did not sexually abuse any of them, we conclude that such does not constitute proper character testimony. The relatives' own experience with [Van Horn] and their perceived relationship between [Van Horn] and the victim is not testimony regarding [Van Horn]'s "general reputation in the community." To the extent [Van Horn] alleges that his relatives would have testified concerning his "good character" in the community, we find this issue to be waived. Aside from stating that his relatives testified at the PCRA hearing regarding his character among the community, [Van Horn] has failed to develop the issue further. He fails to cite the location in the record where such testimony from the PCRA hearing may be found and has failed to indicate precisely what character evidence to which he is referring. The bald assertion that his relatives testified at the PCRA hearing to his character and reputation as expressed to them by the community is insufficient to permit meaningful review. Pa.R.A.P. 2119.
>
> Moreover, assuming, *arguendo*, that [Van Horns]'s relatives testified at the PCRA hearing that they would have offered admissible character evidence at trial, we conclude that trial

- 26 -

counsel had a reasonable basis for not presenting the witnesses' testimony to establish [Van Horn]'s character. During the PCRA hearing, Attorney Minotti testified that he did not call character witnesses because he believed that they would be cross-examined concerning [Van Horn]'s prior convictions for burglary and statutory rape. We conclude that this was a reasonable trial strategy, and counsel was not ineffective on this basis.

*Id.* at 988 (citations omitted).

First, the *Van Horn* Court found that Van Horn failed to present proper reputation evidence at all, instead proffering testimony from his relatives about his relationship to the victim based on the witnesses' personal observations alone. Unlike what occurred in *Van Horn*, Appellant proffered admissible testimony regarding his reputation for non-violence at the PCRA hearing.[10] Second, to the extent the *Van Horn* considered proper reputation testimony, it determined the reputation-evidence claim had been waived due to Van Horn's failure to develop it.

Nevertheless, in the *Van Horn* Court's alternative analysis, it determined that Van Horn's trial counsel had a reasonable basis to refuse to offer reputation testimony at trial—Van Horn's trial attorney testified that offering those witnesses would have opened the door to revealing Van Horn's prior convictions for statutory rape and robbery. *Id.* However, here,

_____

[10] To reiterate, Appellant's witnesses offered both their personal opinions of his character and proper reputation evidence. The witnesses' personal opinions about Appellant's relevant character traits would not have been admissible at Appellant's trial and, therefore, do not factor into our analysis of whether Appellant was prejudiced by the absence of such testimony. We consider only the witnesses' testimony that constituted proper reputation evidence, as discussed above.

Appellant did not have any prior convictions that might contradict his reputation for non-violence.[11]  Moreover, Attorney Spessard never testified that his refusal to present character witnesses was due to a fear of opening the door for the Commonwealth to present unfavorable evidence; he merely acknowledged that he was aware of that potential evidence.[12]  Consequently,

---

[11] The Commonwealth points to the fact that it had tried to introduce evidence at trial of Appellant's sexual aggression toward Ms. Hetrick, evidence that it might have offered in rebuttal to Appellant's reputation evidence.  **See** Commonwealth's Brief at 29.  Even assuming that such rebuttal evidence would have been admitted to counter Appellant's ostensible reputation for non-violence, the prejudice stemming from evidence of such uncharged criminal conduct toward another adult pales in comparison to the potential prejudice of evidence of a prior criminal conviction for statutory sexual crimes in a case involving Van Horn's sexual assaults of a minor over several years.  Thus, **Van Horn**'s alternative analysis does not suggest, much less compel, a determination that Appellant was not prejudiced here by the absence of reputation evidence because of the potential for rebuttal, where the rebuttal evidence in **Van Horn** was substantially more prejudicial to Van Horn than the rebuttal evidence in this case would have been to Appellant.

[12] Indeed, Attorney Spessard filed a successful motion *in limine* to exclude that evidence, so there is no dispute that he was aware of it consistent with his testimony.  **See** N.T., 7/16/20, at 51-52.  However, at the PCRA hearing, he never testified that that was the reason for his failure to call character witnesses.  In fact, when this matter was addressed at the PCRA hearing, the Commonwealth repeatedly denied that it was even trying to solicit such testimony.  **See id.** at 52-58.  At no point was Attorney Spessard asked if the potential rebuttal testimony affected his decision to not call character witnesses, and the Commonwealth specifically acknowledged that he had already "testified as to why he didn't call character witnesses."  **Id.** at 57.  When asked by the court if the Commonwealth was trying to establish a reasonable basis for Attorney Spessard's failure to call character witnesses based on the at-issue evidence, the Commonwealth responded that it was only soliciting evidence to aid the court in addressing whether Appellant was denied a fair trial, not as to whether counsel had a reasonable basis for his actions.  **Id.** ("I'm trying to bring out what type of evidence could have come
*(Footnote Continued Next Page)*

we disagree with the Commonwealth that **Van Horn** supports the ruling of the PCRA court.

In sum, for the reasons stated above, we conclude that the PCRA court's determination, that Attorney Spessard's failure to call the proposed character witnesses did not deny Appellant a fair trial, was unsupported by the record and legally unsound. As was the case in **Weiss**, this case hinged on a credibility contest between Appellant and S.M., and the circumstances of this case are such that Appellant was prejudiced by the absence of reputation evidence at least as much as the prejudice suffered by the petitioner in **Weiss**. Accordingly, Appellant's ineffectiveness claim is meritorious, and he is entitled to a new trial on that basis.

Next, Appellant asserts that Attorney Spessard was ineffective for failing to effectively cross-examine the victim with her prior inconsistent statements. Although we have already determined that Appellant is entitled to a new trial pursuant to his first IAC claim, we will address his second IAC claim as a matter of judicial economy.

Appellant argues that,

---

forward … that when you're weighing whether or not that would have made a difference, I think that ultimately, if this evidence would have come in, it would have been detrimental to call character witnesses knowing this evidence was out there."). To the extent that the Commonwealth now contends that Attorney Spessard possessed a reasonable basis to refuse to offer character testimony based on the potential of rebuttal evidence from Ms. Hetrick, the record simply does not support such a claim. Attorney Spessard never asserted that as a basis for his failure to present reputation evidence.

in her earlier statement to the police, S.M. was very specific in recounting that, shortly before the assault, [Appellant] was massaging both her and her sister's feet at the apartment. And immediately before the claimed assault, [Appellant] rubbed her buttocks. In contrast, when she testified at trial, S.M. did not state that shortly before the assault[, Appellant] was giving both her and her sister massages at the apartment. Moreover, at trial, S.M. failed to mention this prolonged period where [Appellant] massaged her buttocks immediately before raping her.

Appellant's Brief at 53. Furthermore,

trial counsel conceded that he was ineffective for failing to impeach S.M. with these "major" prior inconsistent statements. In trial counsel's own words, "[p]articularly in a case like this where the credibility of a witness is the bulwark of the Commonwealth's case, my failure to address this inconsistency was catastrophic…." Trial counsel elaborated that there was simply no legitimate reason for his failures; on the contrary, he had planned to impeach S.M. with these prior inconsistent statements but then, in heat of trial, the matter "slipped [his] mind."

*Id.* at 55 (citing N.T., 7/16/20, at 33-35).

Relying on ***Commonwealth v. Simmons***, 662 A.2d 621 (Pa. 1996),

the PCRA court determined that,

[i]n the present case, [Appellant] did not present evidence at the PCRA hearing indicating that the victim S.M. made the statements in the earlier police report and that she adopted the statements or that the report contained her *verbatim* statements. Thus, the deputy's report was not admissible to impeach the victim. For this reason, the claim of ineffectiveness lacks arguable merit and [Appellant] was not prejudiced.

PCO1 at 21. Additionally, the court determined that even had the victim adopted the prior police report as her own statement, or had the report presented the victim's *verbatim* statements, "the dissimilarities or omissions" between her testimony and the prior statements "were not substantial enough

- 30 -

to cast doubt on [her] testimony to be admissible as prior inconsistent statements." *Id.* at 22.

In *Simmons*, our Supreme Court recognized generally that "prior inconsistent statements are admissible as substantive evidence and for impeachment purposes[,]" and those used as "substantive evidence are limited to statements: (1) that have been given under oath at a formal legal proceeding; (2) that have been reduced to a writing and signed and adopted by the witness; or, (3) that are a contemporaneous *verbatim* recording of the witness's statement." *Simmons*, 662 A.2d at 637.

> As for impeachment based on prior inconsistent statements, it is axiomatic that when attempting to discredit a witness' testimony by means of a prior inconsistent statement, the statement must have been made or adopted by the witness whose credibility is being impeached. A written report which is only a summary of the words of the victim and not *verbatim* notes from the victim cannot be used to impeach the witness on cross-examination since it would be unfair to allow a witness to be impeached on a police officer's interpretation of what was said rather than the witness' *verbatim* words.

*Id.* at 638 (cleaned up).

In Appellant's brief, although he appears to directly address the PCRA court's second basis for denying this IAC claim, his arguments are completely unresponsive to the PCRA court's primary reason for denying relief: that Appellant failed to demonstrate that Attorney Spessard could have used the police report containing S.M.'s allegedly inconsistent prior statement for impeachment purposes under *Simmons*, where the report was not shown to be a *verbatim* record of S.M.'s statements or otherwise adopted by S.M. as

her own statement. Consequently, we conclude that Appellant's second claim is waived due to his failure to adequately develop it for our review.

Order *reversed*. Case *remanded* for a new trial. Jurisdiction *relinquished*.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/31/2022